FRANCIS SWIFT, Claimant, etc., Respondent, *v*. THE STATE OF NEW YORK, Appellant.

The commissioners appointed under the act of 1866 (Chap. 751, Laws of 1866), " in relation to quarantine in the port of New York," under the power given in said act to award the contract for the work therein provided for to the person who should " offer to erect the same for the lowest sum," advertised for proposals, giving notice that the successful bidder " must furnish all the material necessary to complete the entire work " according to the plans and specifications. Also, that if the commissioners required any alterations in plans or mode of construction, the value of the same must be agreed upon " before such alteration is made." Claimant sent in proposals, stating that he had examined the plans, specifications and form of contract, and would contract to build the structure in the manner and on the conditions specified therein, upon prices named separately for each kind of work, the prices named " to cover the expense of furnishing all the necessary materials and labor, and the performance of all work set forth." These proposals were accepted and a contract entered into, by which the advertisement, proposals, plans and specifications were declared to form part thereof, and claimant agreed to construct and fully complete the work, the State to pay therefor the sum of $252,491.68, which was stated to be the aggregate cost of the construction at the prices specified in the proposals, to be paid in installments of $20,000 each, on certificates of the engineer that the work performed and material furnished up to the time of giving the certificate amounted to at least fifteen per cent more than the amount of that and prior installments, the last installment to be paid when the entire work was " fully completed." *Held*, that the contract provided for a completed work at the fixed sum named; the intent being to prevent the necessity of measurements and computations after it was executed ; and that plaintiff's legal rights were limited to the contract-price, save as to alterations provided for.

The contract authorized alterations to be made, and it was provided that "if such alterations increase the amount of the work, such increase shall be paid for only according to the quantity actually done and at the prices fixed in such proposal for similar work," to be determined by the engineer ; after the completion of the work, the engineer gave a certificate of that fact, also stating that certain alterations had been made, which increased the amount of work in the sum of $12,351.77. Plaintiff, knowing the contents of the certificate, received by virtue thereof the balance unpaid of the sum specified in the contract, and the sum specified in the certificate for the additional work, giving a receipt, stating that it was "in payment of the balance due him." Plaintiff presented a claim to the board of audit for a further sum which was allowed. There was no claim or evidence of error or mistake on the part of claimant in giving the receipt. On appeal as authorized by the act of 1881 (Chap. 211, Laws of 1881), *held,* that the claimant was not entitled to a further sum under or by virtue of the contract ; that the adjustment by the engineer with the knowledge of the claimant and the receipt by him as a final payment concluded him from making a further demand against the State ; also, that there was no moral consideration upon which the claim could be based.

The State engineer and surveyor was required by resolution of the legislature to make a survey and estimate of the amount of work done under the contract ; said engineer made a report, stating in substance, that his deputy had made the survey and estimate required. The deputy testified that in making measurements to distinguish between work done under this contract and a subsequent contract relating to the same matter, he received his data entirely from one H. and that the computation was not based upon exact measurements ; it appeared that it was impossible to distinguish between the work done under the two contracts. Upon this estimate and information received from others, the engineer reported the work done by claimant, at the prices specified, amounted to $39,375.12 in excess of what he had received. The claim and allowance was for this excess. *Held,* that the question before the board was to be determined upon common-law evidence ; that the report of the engineer was no evidence, and there was nothing to sustain the allowance. (State Const. art. 3, §§ 19, 24.)

*Swift* v. *The State* (26 Hun, 508), reversed.

(Argued April 14, 1882 ; decided April 25 1882.)

APPEAL from judgment of the General Term of the Supreme Court in the second judicial department entered upon an order made February 13, 1882, which affirmed an award of the State board of audit, in favor of Francis Swift, for $39,- 375.12. (Reported below, 26 Hun, 508.)

The claim presented to the board of audit alleged "that in or about the month of August, 1868, he, said claimant, made and entered into a contract with the State of New York for the erection, on the west bank in the lower bay of New York, of a structure for quarantine purposes, under and in pursuance of the act of the legislature of the State of New York, entitled "An act in relation to quarantine in the port of New York, and providing for the construction of the permanent quarantine establishment," passed April 21, 1866 (chap. 751 of the Laws of 1866).

That all and singular the conditions precedent in and by said act provided were, as this claimant is informed and believes, and upon his information and belief avers, duly performed and complied with." * * *

" That he proceeded with the work under said contract diligently and in good faith, and in all things duly performed the same, and all the covenants and agreements therein, on his part expressed, duly kept and fulfilled.

" And the statement of the claimant further shows : That from natural causes, against or for which human foresight was unable to provide, there was necessarily, and without any fault of claimant, consumed in and about the erection of said structure a larger quantity of materials than had been provided for in the original estimates.

" That all such additional consumption of materials was made under the immediate direction and superintendence and pursuant to the directions of the engineer of the State, in charge of said work.

" That the entire structure was completed on or about the 1st day of January, 1871, and the State accepted same, and entered into occupancy thereof on or about said day, and is now, and ever since the said last-mentioned day has remained in occupancy thereof.

" That on the 7th day of May, 1872, the honorable the assembly of this State passed the following resolution :

" ' *Resolved*, That the State engineer and surveyor be, and he is hereby required to make a survey and estimate of the num-

ber of cubic yards of crib-work, stone, sand and other materials built, filled in, and furnished in the construction of Quarantine island No. 2, in the lower bay of New York, under contract of August 10, 1868, between the quarantine contracting board and Francis Swift, and report the same to the assembly.

" That in pursuance of said resolution, the then State engineer and surveyor made the survey and estimate therein required, and made the report thereof to the assembly.    *    *    *

" That the total amount which this claimant, according to the report of said State engineer and surveyor, became entitled to receive from the said State, for and on account of the erection of the said structure, was $304,218.57.

" That upon account of such sum there has been paid this claimant, by the State, the sum of $264,843.45, and there now remains legally and equitably due the claimant from the State, in the premises, over and above all payments and offsets, the just and full sum of $39,375.12, with interest from the 1st day of January, 1871. "

The material portions of the contract and the facts are substantially set forth in the opinion.

*Leslie W. Russell,* attorney-general, for appellant. The board of audit erred in admitting in evidence the report of the State engineer and surveyor, made in pursuance of the resolution of the assembly in 1872, against the objection of the attorney-general. (*Seavey* v. *Seavey,* 37 N. H. 125.) The estimate made up was without authority, and of no force whatever as evidence of the liability against the State upon a trial conducted upon principles of the common law. (*B'd of Water Commrs.* v. *Lansing,* 45 N. Y. 10.) There was an acceptance and settlement as to extra compensation within the rules pertaining to such cases, binding upon both parties, and neither can the State recover it back nor can the claimant recover a sum beyond that amount. (*Herrick* v. *Ames,* 1 Keyes, 190 ; *McIntyre* v. *Warren,* 3 id. 185.) The furnishing of more material than was contemplated does not give the contractor the right to claim extra. compensation, but the same comes within the aggregate price

of the original contract. (*Collyer* v. *Collins*, 17 Abb. Pr. 467.)

*Wm. N. Dykman* for respondent. In this court this "appeal shall be governed by all the rules and practice now regulating appeals to the Court of Appeals. (Laws of 1881, chap. 211, § 3; *Field* v. *Munson*, 47 N. Y. 221; *Vermilyea* v. *Palmer*, 52 id. 476.) The report of the State engineer to the assembly was competent. It is at least *prima facie* proof of its assertion. (Code of Civil Procedure, § 933; 1 Greenleaf on Evidence, §§ 482–3, 491; *Miles* v. *Stevens,* 3 Penn. St. 41; *People* v. *Denison,* 17 Wend. 312; *Gurno* v. *Janis,* 6 Mo. 330; 3 Cold. [Penn.] 306; *Hayward* v. *Bath,* 38 N. H. 179; *Seavey* v. *Seavey,* 37 id. 125.) Respondent's recovery is not repugnant to the Constitution. (Report of Committee on Powers of Legislature, Proceedings and Debates, vol. 2, p. 1173; *People* v. *Dennison,* 8 Abb. N. C. 133.) The Constitution created a forum wherein the subject could establish that morally the sovereign ought to allow his claim. (Laws of 1876, chap. 444; Proceedings and Debates, Convention 1869; Remarks of Mr. Kernan, vol. 2, p. 1340.) The determination of the State board is "final," unless appealed from, and the appeal is to the courts. (Laws of 1881, chap. 211, § 2; Proceedings and Debates, Convention 1867, vol. 2, p. 1173.)

DANFORTH, J. We think this appeal was well taken. The subject-matter of the claim submitted to the board of audit was materials furnished and work done by the claimant in the erection of a certain structure on the west bank in the lower bay of New York, to be used for quarantine purposes. Its erection was authorized by the legislature in 1866. (Chap. 751, Laws of 1866.) By that act commissioners were appointed, whose duty it was, among other things, to prepare specifications of the work and materials necessary for the erection of the structure, make an accurate estimate of the entire expense (§ 3), advertise for proposals for its construction, and award the contract to the person who should "offer to erect the same for the lowest sum," and give security for the faithful and com-

plete performance of the contract.   They accordingly appointed an engineer (Ritch), adopted plans and specifications, showing with the greatest detail the particulars of the dimensions, the arrangement and mode of construction for every portion of the desired work, and notified persons seeking the contract that the successful bidder must "furnish all the material and labor necessary to complete the entire works as described in the specification and shown in the plans."   It was also provided that if the board of commissioners should require any alterations to be made in the plans or mode of construction during the progress of the construction of the works, it must not be made without an order from the engineer, and the value of the same must be agreed upon "before such alteration is made." It was required that the price should be affixed to each separate portion or item of the work, in the manner stated in the specifications.   As the work when completed would constitute the exterior walls of an artificial island, it was required to be crib work, built in blocks, in part sunk to a designated line, and to be filled up to the top with stone at the time they were sunk. Upon these, other cribs were to be placed, and so a continuous wall erected.   Each crib was required to be filled to within six inches of the top with stone, the space inside the wall to be filled with sand; and the exterior was to be protected with "rip-rap," or stone arranged as stated in the specification.   So much is important as bearing upon the claim before us.

The claimant responded to the advertisement in writing, stating that he had examined the specifications and form of contract, the locality in which the work was to be constructed, and the plans of the same, and that he would "contract to build the structure therein mentioned of the dimensions, in the manner, and on the conditions required by the specifications and form of contract annexed" thereto, upon prices named separately for each kind of material, adding, "the prices above named are to cover the expense of furnishing all the necessary materials and labor, and the performance of all work set forth in the agreement and specifications."   His proposition was accepted and the agreement referred to executed by the con-

tractor and the commissioners on the 19th of August, 1868. Its preamble narrates the act of 1866, the advertisement for proposals, the proposals, which are declared to be annexed to the contract and to form part of it, the award of the contract to the claimant, and thereupon, he agrees, in consideration of the sum agreed to be paid to him by the State, " that he will provide all the necessary materials and labor for, and erect, construct and complete " the said structure " according to the plans and specifications therefor prepared by " said Ritch — referring to them by date and place of filing — " and which," he says, " are to be taken as a part of this agreement as if specifically incorporated therein." It provides that the structure shall be erected under the direction of an engineer selected by the State, and " be fully completed according to said plans and specifications " at a time named.

The State, on its part, agrees that if the contractor performs on his part, it " will pay to him the sum of $252,491.68," " being," in the language of the contract, " the aggregate cost of the construction of the structure at the prices specified in said proposals," to be paid by installments of $20,000, upon the certificate of the engineer that the work performed and the material furnished up to the time the certificate is given, has been performed according to the plans and specifications, and materials furnished at least fifteen per cent in excess of the amount of the respective installments, and the last installment shall be paid when the said engineer shall certify that the said exterior wall and foundation have been in all respects fully completed according to the terms of the contract.

These stipulations furnish a persuasive guide to the intention of the parties. The installment is a sum named, and not graduated by the amount of work done or materials furnished ; but the payment is not to be made until the cost of work and materials furnished exceeds the installments by at least fifteen per cent, no matter how much more the excess ; and the last installment is to be paid, not according to the cost of work or materials furnished — it has no reference to that — but when the work shall have been in all respects " fully completed."

It is evident from all the provisions above referred to that the purpose of the parties was to provide for a completed work at a sum named, and to prevent the necessity of measurements and computations after the contract was executed, by requiring the contractor to inspect, at the beginning, plans and specifications of the entire work, and adjust his price accordingly. If this precaution required justification, its wisdom would appear by reading the evidence given to the board of audit by witnesses who came after the contractor, and whose conjectures, judgments and opinions indicate the difficulty, if not the impossibility, of furnishing satisfactory testimony by measurements, after the fact, of materials really furnished. Of the two methods — estimates before the work, and conjectures after — the parties chose the former. It was fair to do so. Moreover, as it is plain from the words of the contract already quoted that this was the understanding of the contractor, so it further appears from other provisions of the same instrument, requiring the work under the specifications to be done to the satisfaction of the engineer, the materials to be subject to his inspection and rejection, and the contractor " to complete any of the provisions of said specifications according to his directions and explanations."

A complete work was embraced within the plans, proposals and specifications, and nothing less was contemplated by the statute, which required a fixed sum as the price of construction. Experience gained during the construction might require changes, and for those, provision was made, not only as we have already seen, by the specifications, but also by the contract. Its ninth article declares " that if the State, or its engineer, shall, during the progress of the work, deem it necessary to make any alteration in the plan or mode of construction, they shall have power to make the same　*　*　* and if such alterations increase the amount of the work, such increase shall be paid for only according to the quantity actually done and at the price fixed in such proposals for similar work under this contract."

It thus appears that the scheme involved, first, a work exe-

cuted according to plans and specifications, at a fixed price; second, extra or additional work and materials if made necessary by changes in the contract plan, to be paid for at prices already ascertained. Both parts of this scheme are covered or provided for by the contract. Work went on under it to a conclusion; the structure was finished. On the 28th of December, 1870, the contractor obtained from the engineer (Ritch) a writing which contains, we think, a full and satisfactory answer to the claim now made. Referring to the statute (Laws of 1866, chap. 751, *supra*), the engineer certifies that Swift, the contractor, " has completed the structure agreed to be constructed by him by his contract bearing date, August 18, 1868." He then states that soon after the commencement of the work, a portion of the fabric was displaced and carried away; that in consequence thereof it became necessary to change the plan of the structure, at the base, and that pursuant to the provisions of the ninth article of said contract, he did thereupon change the same, and deemed it necessary in the progress of the work to further change the plan of the structure in a manner which he specifies, and then says, " by such changes the contractor was obliged to perform labor and furnish materials to a considerable amount over and above what he would have been required to perform and furnish had said work been constructed wholly in accordance with the original plan and specifications referred to in said contract; that said contractor has now fully completed his contract according to said plans and specifications as thus modified, and that the work performed, and the materials furnished, in all respects, conformed to said modified plan and said specifications; *that from measurements made by me during the progress of the work and since its completion, I have ascertained the quantity* of materials furnished and the amount of labor performed in excess of what would have been required had no changes been made in said plan, and I have computed the amount which the said contractor is entitled to receive for said extra work and materials, according to the provisions of said ninth article, and the same amounts to the sum of $12,351.77. I do therefore certify that in my judgment the

said contractor is now entitled to receive the balance due him upon the original contract-price of said work, and also said sum of $12,351.77 for said extra.work and materials."

It is not only apparent that the contractor was a party to this certificate, knowing its entire contents but there are provisions in the agreement which show that he must have been an active as well as a silent witness to its correctness. By one of the articles of the agreement, he was required to give his personal attention to the faithful prosecution of the work, and by another it is declared that before he should be entitled to receive either of the installments, or any payment, he must produce to the engineer satisfactory evidence that all persons who had done work, or furnished materials under the agreement had been fully paid. The fact of such information need not be dwelt upon, for neither mistake nor ignorance is pretended.

On the strength of the certificate he received from the board of commissioners a draft, dated December 30, 1870, payable to his own order, addressed to the comptroller of the State, for the sum of $44,843.45, "in payment," as the recital is, "of the balance due him" upon his contract for the erection of the structure in question. It was accompanied by a certificate signed by the president of the board, and addressed to the comptroller, certifying "that the amount of the annexed draft is to be applied to the payment of the said balance," according to the terms of his contract aforesaid, and that the said draft is given upon the certificate of the engineer, above referred to. The draft and the two certificates were attached together, and the contractor, or his indorsee, presented the same for payment and received it as early at least as the 11th of January, 1871, for on that day the draft indorsed by Swift, and the accompanying certificates were surrendered to the comptroller. It further appears from the contractor's verified statement of claim presented to the board of audit that he admits the receipt from the State of the sum of $264,843.45, on account of the erection of the structure, and as this sum equals the contract-price of $252,491.68, and the sum of $12,351.77 allowed for extra work, it may be implied that it is made up of those two

sums. It is, therefore, very difficult to see how any claim could be sustained for a further sum on account of the matters referred to in the contract.

But, nevertheless, the claimant has been allowed the further sum of $39,375.12. What is his case ? It is obvious from his statement of it that the work and materials for which he asks payment came under the agreement. He recites the contract and makes it part of his statement. Then he avers, " that he proceeded with the work under said contract diligently and in good faith, and in all things duly performed the same, and all the covenants and agreements therein, on his part expressed, duly kept and fulfilled ; " and further, " that from natural causes, against or for which human foresight was unable to provide, there was necessarily, and without any fault of claimant, consumed in and about the erection of said structure a larger quantity of materials than had been provided for in the original estimates ; that all such additional consumption of materials was made under the immediate direction and superintendence, and pursuant to the directions of the engineer of the State, in charge of said work ; that the entire structure was completed on or about the 1st day of January, 1871, and the State accepted same, and entered into occupancy thereof on or about said day, and is now, and ever since the said last-mentioned day has remained in occupancy thereof."

It seems plain, from the facts already stated, that there can be no merits in such a claim. The contract provided for a completed work at a fixed price, and for extra work and materials made necessary by the very causes which in this statement are put forth as the reason for departing from its limitations. It also provided for a determination by the engineer in charge as to the extra work and materials necessary ; and his adjustment made with the knowledge of the claimant of the amount of extra work and materials and the sum due therefor, and the receipt of that sum by the claimant as a final payment of his account concludes him from making any further demand against the State. It is not necessary to deny that such a transaction might be open to explanation, and that as between individuals,

so against the State, an error or mistake could be alleged as ground for opening the settlement. But nothing of that kind is pretended, and full legal effect must be given to it, and the adjustment between the parties be deemed final.

The learned counsel for the respondent, however, contends that the claim can stand upon the moral consideration growing out of the fact that the State received more than it has paid for. In this is error, both of fact and law. *First*, he claims that the engineer in charge changed the plan and thereby increased the quantities of materials and work. This is conceded; but he further assumes that the increased quantities " put in place under the supervision of the engineer entitled the contractor to $39,375.12 in addition to the sum of $12,351.77. Of this there is no evidence. Indeed the claimant seems to have intentionally avoided such an allegation. Instead of showing by his own averment or by his own testimony the fact which, if it existed, must have been for reasons already stated within his own knowledge, he refers to the report of W. B. Taylor, the State engineer, in office in 1873, and says, " according to that he became entitled to receive, on account of the erection of the structure, $304,218.57," that he received in all only $264,843.-45, and claims the difference between these sums, viz., $39,-375.12, not, therefore, on account of extras, but the entire contract.

Yet the report of the engineer to which he refers is, neither as evidence or information, of the least value. He was " required by resolution of the assembly to make a survey and estimate of the number of cubic yards of crib work, stone, sand and other materials built, filled in and furnished in the construction " of the work, under contract of August, 1868. It appears that the duty enjoined upon him was not performed in person, and his answer to the inquiry is, by its very terms, the result of information communicated to him by others. He says, "I visited the island, examined the work, and instructed my deputy, John A. Cooper, who accompanied me, to make the necessary survey and estimate." The report states, " during the progress of construction repeated delays and damages were

sustained by the contractor, and consequently much vary-
ing testimony as to the nature and extent of his claims was pre-
sented for consideration."

It is obvious that no part of this declaration was called for
by the inquiry; but the report itself, based as it is upon in-
formation derived from others and upon an estimate not made
by the engineer in person, could under no circumstances be
considered as evidence of any fact therein stated. Nor was it
intended to be the basis of any legal claim; before the board
of audit the claimant was himself a witness; he proved the
execution of the contract, established the fact that the State
took possession of the structure in January, 1871, and con-
tinued in possession. He goes no further; speaks neither of
the quantity of materials required by the contract, or furnished
in the execution of the work described in it, nor of any extra
materials furnished. Upon both questions he is silent.

In his behalf, however, was examined John A. Cooper and
Charles R. Haswell. Cooper was deputy State engineer from
the 1st of January, 1873, until the 1st of January, 1874. He
testifies that he went with Taylor to the island, with the assistance
of Haswell, made measurements, received his data entirely
from Haswell, for the purpose of distinguishing between work
performed under the contract, and a subsequent contract re-
lating to the same matter. He says, "upon those measure-
ments the report of Taylor was made." He is asked by the
claimant's counsel this question, "I wish you would state
whether that report of the State engineer upon the basis of your
measurement was a fair and faithful computation of the
quantities that had been put upon the island by Swift?"
Answers. "Yes; as mathematically correct as I could make it."

It appears from his testimony that the State engineer was
not present at any time while measurements were being taken.
Changes at that time had occurred in the structure through
settlement, and the extent of these changes he got at approxi-
mately. When asked how near to accuracy he could come,
replies, "It depends upon the ability to approximate; some
men could not approximate within a hundred feet, and it

depends upon training — it is a question of training altogether."
Asked, " I want to find out how near it was so as to be a basis
of measurement ? "   Answers, " you have to use the best of
your judgment backed by the best of your experience in the
case."   Asked, " tell us how you got at it to tell the amount the
structure had settled ? "  Answers, " by taking these different
datas and using my judgment as to how much the island had
settled at different places, I can approximate within five per
cent of any thing."   Asked, " then the result you arrived at
was not based upon computation of exact measurement ? "
Answers, " no, it could not be."   Asked, " then you had to
speculate somewhat ? "  Answers, " more or less."  Asked, " did
you make up the report ? "   Answers, " no, sir ; Mr. Taylor
did."   Asked, " you furnished him with the basis ? "  Answers,
" no, sir ; he overlooked my work ; these plans and computations
were made in Albany."   Asked, " did you examine any wit-
nesses ? "   Answers, " no, sir."   Asked, " did you take any
testimony down there ? "  Answers, " not under oath."  Asked,
" did you take any not under oath ? "   Answers, " yes, sir."
Asked, " whom did you examine ? "   Answers, " different ones
connected with it ; I had to take conflicting statements in
regard to it."   Asked, " who were the different persons you
examined ? "   Answers, " parties connected with the work."
Asked, " you made allowance for settling ? "   Answers, " yes."
Asked, " you made that upon what you call just and equitable
principles ? "  Answers, " as near as I could bring them ; I had
a consultation with the State engineer with reference to it ; the .
State engineer's decision controlled mine ; we thought with all
the evidence I could get, that that would be a just and equitable
arrangement to allow a settlement of two courses."   Asked,
" you examined parties in the way of witnesses, but they were
not sworn ? "  Answers, " yes."

Mr. Haswell testifies that in February or March, 1871, he
was appointed by the quarantine commissioners an engineer
and architect in charge of the work ; that Swift was then in
the process of fulfilling a later contract of 1870, for additional
stone.   Prior to that time he had filled the contract of 1868.

He recollects Cooper, the preceding witness, making measurements and that he pointed out to him what quantities of stone delivered under the contract of 1870 were to be taken out from the measurements. He says, he never computed data and details of the measurements, but these computations were correctly and scientifically made.

The witness shows that it was impossible to distinguish between stone furnished under the two contracts; but being asked if he could tell the difference approximately, answered, "I could tell it sufficiently to satisfy my sense of duty." Being asked by counsel to state what portion was under water as near as he could guess at it, answered, "I cannot give you an estimate of it here, but I can give you a diagram to show you how it was got at." Asked, "you made no computation yourself that went into the report?" Answered, "no, sir; I was not called upon to do it."

Now it is impossible to say that the testimony of this witness either verifies the report submitted by the State engineer, or contains material from which an award could be made.

The question before the board of audit was to be answered by them upon common-law evidence, and according to rules of law which would have been applicable to the adjustment of a similar claim arising between individuals. Only in this way could it comply with the duty imposed by statute, "to administer oaths and take testimony in relation thereto," and so "determine the justice and amount" of the alleged claim. (Laws of 1876, chap. 444; Laws of 1881, chap. 211, § 3), that it might "be audited or allowed according to law." Such claims only as had been so dealt with could be paid or allowed by the legislature. (Constitution, art. 3, §§ 19, 24, as amended in 1874.) There is here neither legal evidence to sustain the claim, nor moral considerations which might make its denial an apparent hardship, and on the other hand there is a defense, both in law and equity, to the benefit of which the State is entitled.

The judgment appealed from should, therefore, be reversed, and although we discover no ground on which the claimant

can recover upon the case presented by him, we grant a new hearing before the board of audit in accordance with our practice on appeals from other tribunals. (Laws of 1881, chap. 211.)

Judgment reversed and new hearing ordered, with costs to abide the event.

All concur, except RAPALLO, J., not voting;, ANDREWS, Ch. J., concurring in result

Judgment reversed.