GRAFTON.

---

## WOOSTER v. PLYMOUTH.

In an action, given by statute (Gen. St., *c.* 69, *s.* 1) to a traveller, against a town for an injury caused by a defect in a highway, a right of trial by jury is not secured to the defendant by the constitution.

Under Gen. Laws, *c.* 231, *s.* 10, such a case may be committed to one or more referees without the defendant's consent.

CASE, on Gen. St., *c.* 69, *s.* 1, for an injury happening to a traveller, March 3, 1876, by reason of a defect in a highway. The action was entered at the November term, 1876. After one jury trial at the May term, 1877, and another at the November term, 1878, both juries failing to agree, the plaintiff moved that the case be committed to one or more referees, and the defendants objected. The amount in controversy exceeds $100.

| | |
|---|---|
| 62 | 193 |
| 66 | 76 |
| 66 | 514 |
| 66 | 631 |
| 66 | 661 |
| 62 | 193 |
| 67 | 280 |
| 67 | 554 |
| 62 | 193 |
| 69 | 30 |
| 69 | 92 |
| 69 | 331 |
| 69 | 560 |
| 62 | 193 |
| 70 | 107 |
| 70 | 414 |
| 62 | 193 |
| 71 | 371 |
| 71 | 372 |
| 71 | 555 |
| 62 | 193 |
| 74 | 531 |
| 74 | 536 |

*L. W. Fling*, *Barnard & Barnard*, and *Bingham*, *Mitchell & Batchellor*, for the plaintiff.

*Burrows & Jewell*, *Burleigh & Adams*, and *N. B. Bryant*, for the defendants.

Doe, C. J. —" The court may, . . . with or without the consent of the parties or either of them, commit to one or more referees any cause at law or in equity, or the determination of any question of fact pending in said court, wherein the parties are not, as matter of right, entitled to a trial by jury." G. L., *c*. 231, *s*. 10. In this traveller's highway-suit against a town, the plaintiff moves for a reference. The defendants object, and claim a constitutional right to a jury trial. And the question arises, whether, in the vindication of rights purely public, the state is constitutionally entitled to trial by jury, and, if it is not, whether, in this case, the defendants stand in the position of the state, or in the position of a private person.

I. Historically and constitutionally, jury trial is a remedial protection of substantive rights. But of whose and what rights, and against whom, is it a protection? It is trial by the country,—by fellow-subjects and peers. It "has been steadily regarded, from the earliest judicial history in England, as the great safeguard of the lives, liberty, and property of the subject against the abuses of arbitrary power, as well as against undue excitements of popular feeling. In our own country, almost from its earliest settlement, the trial by jury was claimed by the people as the birthright of Englishmen, and as the most valuable of the rights of freemen." 41 N. H. 550. "Jury trial was an established right of British subjects long before the earliest settlement of this state." *Perkins* v. *Scott*, 57 N. H. 55, 79.

The fundamental articles of "the absolute rights of every Englishman" (" usually called their liberties ") were asserted in the great charter of liberties, frequently reaffirmed by parliament; in the petition of right; in the bill of rights or declaration delivered to the Prince and Princess of Orange, and enacted by parliament; and in the act of settlement of 1701. The rights defined by these statutes consist in a number of "private immunities," which are indeed no other than either that residuum of natural liberty which is not required by the laws of society to be sacrificed to public convenience, or else those civil privileges which society has engaged to provide in lieu of the natural liberties so given up by individuals. 1 Bl. Com. 127, 128, 129. In the great charter, trial by jury is "insisted on as the principal bulwark of our liberties." It "ever has been, and I trust ever will be, looked upon as the glory of the English law. . . . It is the most transcendent privilege which any subject can enjoy, or wish for, that he cannot be affected either in his property, his

liberty, or his person, but by the unanimous consent of twelve of his neighbors and equals. A constitution that I may venture to affirm has, under Providence, secured the just liberties of this nation for a long succession of ages." 3 Bl. Com. 350, 379. The trial by jury is "that trial by the peers of every Englishman which, as the grand bulwark of his liberties, is secured to him by the great charter. . . . The liberties of England cannot but subsist so long as this palladium remains sacred and inviolate." 4 Bl. Com. 349, 350. Its entire legal significance is the immunity which every subject finds for his property, liberty, and person in the unanimous verdict of twelve of his neighbors and equals. The defence of the public rights of the sovereign or the government is no part of the protection which this constitutional bulwark was intended to afford.

"The trial *per pais*, or by a jury of one's country, is justly esteemed one of the principal excellencies of our constitution; for what greater security can any person have in his life, liberty, or estate, than to be sure of not being devested of, or injured in, any of these, without the sense and verdict of twelve honest and impartial men of his neighborhood? And hence we find the common law herein confirmed by Magna Charta." Bac. Abr., *tit.* Juries; Hale Com. Law, *c.* 12, Runnington's note. "The trial by jury is that point of their liberty to which the people of England are most thoroughly and universally wedded." De L. Const., *c.* 13, *p.* 136. The great charter "is still the key-stone of English liberty. . . . The essential clauses of Magna Charta are those which protect the personal liberty and property of all freemen, by giving security from arbitrary imprisonment and arbitrary spoliation. 'No freeman . . . shall be taken, or imprisoned, or be disseized, . . . but by lawful judgment of his peers, or by the law of the land. We will sell to no man, we will not deny or delay to any man, justice or right.' It is obvious that these words, interpreted by any honest court of law, convey an ample security for the two main rights of civil society." 2 Hallam Middle Ages 326, 327, 328. In the treatise addressed to "Edward, Prince of Wales," and written for his instruction, after describing trial by jury, and setting forth its superiority over the civil-law trial, Fortescue says,—"Under such laws, every man may live safely and securely. Judge, then, good Sir, which law is rather to be chosen, putting yourself in the private capacity of a subject." De Laudibus Legum Angliae, *cc.* 25, 26, 27. The mass of the people needed no commendation of an institution under which they might live in safety. Viewed from the position of an heir apparent to the throne in the fifteenth century, a tribunal of the people was a bulwark not likely to excite admiration. To enable the prince to appreciate it, it was necessary to lead him from the stand-point of royalty to "the private capacity of a subject." "In prosecutions instituted by the government, the trial by jury will always be

upheld on account of the protection it affords to individuals, in an unequal contest with the authority of the state. In the most perilous and arbitrary times, it has proved a safeguard to the subject." De Laudibus, *c.* 30, Amos's note.

The right of trial by one's peers was brought to this country, as a safeguard of English subjects, by men seeking the enjoyment of English liberties. 2 Kent Com. 6. "No freeman," says the king in the great charter, "shall be arrested, or imprisoned, or disseized *.* . . unless by the lawful judgment of his peers or by the law of the land. We will sell to no man, we will not deny or delay to any man, justice or right." Arts. 39, 40. "No subject," says our bill ·of rights, "shall be arrested, imprisoned, despoiled, . . . but by the judgment of his peers or the law of the land." "Every subject of this state is entitled . . . to obtain right and justice freely, without being obliged to purchase it; completely, and without any denial; promptly, and without any delay." Arts. 15, 14. By the express terms of the great charter, the right of trial by peers was not a security of the government, but a liberty granted by the sovereign to his free subjects. "John, by the grace of God King of England, . . . to his . . . justiciaries, . . . officers, and to all bailiffs, and his lieges, greeting. Know ye, that we · . . have . . . granted. . . . We also have granted to all the freemen of our kingdom . . . all the underwritten liberties, to be had and holden by them and their heirs, of us and our heirs." In our bill of rights, jury trial is a liberty reserved by the people, and excepted out of their grant of governmental power. Equally in the great charter and our bill of rights, it is a private right of the subject, and not a public right of the state.

The clause of the fifteenth article of the bill in which it is reserved " is so manifestly conformable to the words of Magna Charta, that we are not to consider it as a newly invented phrase, first used by the makers of our constitution; but we are to look at it as the adoption of one of the great securities of private right, handed down to us as among the liberties and privileges which our ancestors enjoyed at the time of their emigration, and claimed to hold and retain as their birthright. These terms, in this connection, cannot, we think, be used, in their most bald and literal sense, to mean the law of the land at the time of the trial; because the laws may be shaped and altered by the legislature, from time to time; and such a provision, intended to prohibit the making of any law impairing the ancient rights and liberties of the subject, would under such a construction be wholly nugatory and void. The legislature might simply change the law by statute, and thus remove the landmark and barrier intended to be set up by this provision in ·the bill of rights. It must therefore have intended the ancient established law and course of legal proceedings, by an adherence to which our ancestors in England, before the settlement of this country, and the emigrants themselves and their descendants, had found

safety for their personal rights." *Jones* v. *Robbins*, 8 Gray 329, 342. 343, 344. " This provision of the bill of rights was unquestionably designed to restrain the legislature, as well as the other branches of government, from all arbitrary interference with private rights. It was adopted from Magna Charta, and was justly considered by our forefathers, long before the formation of our constitution, as constituting the most efficient security of their rights and liberties." Mason's argument for the plaintiff in *Dartmouth College* v. *Woodward*, Farrar's Report, 56. In the decision of that case, this court said,—" The object of the clause in our bill of rights . . . seems always to have been understood in this state to be the protection of private rights." 1 N. H. 129.

The division of the constitution into two parts was not made without a purpose, and the name of each part is not without significance. The first is a " bill of rights:" the second is a "form of government." The second is, in general, a grant of powers, made by the people to "magistrates and officers of government," who are declared (in Part I, art. 8) to be the grantors' "agents." The first contains a list of rights not surrendered by the people when they formed themselves into a state. Part I, arts. 1, 2, 3; Part II, art. 1. By the reservation of these, they limited the powers they granted in the second part, and exempted themselves, to the stipulated extent, from the authority of the government they created. In Pennsylvania, the convention of 1776 made a similar division, the bill of rights being "declared to be a part of the constitution." In the revision of 1790 the bipartite form and the original name of the first part were discarded, and the bill of rights was inserted as "Article IX" of the constitution. In the last section of the article, "the people of the commonwealth of Pennsylvania" say,— "To guard against transgressions of the high powers which we have delegated, we declare that everything in this article is excepted out of the general powers of government." This declaration did not give the article a new legal character. In 1776, its title was, " A Declaration of the Rights of the Inhabitants of the State of Pennsylvania." Under any name, in any part of the organic law, it is a reservation. To insert in it a clause expressly declaring it to be a list of rights reserved or excepted, would be as superfluous as to stipulate that a jury shall consist of twelve men, or that their verdict shall be unanimous.

In their general purpose, as well as in several provisions and in name, American bills of right follow the English declaration of rights, presented, by the convention of 1688, to William and Mary before their coronation, and afterwards introduced in parliament as a bill, and enacted in due form. In the English statute-book, the title is " An Act declaring the Rights and Liberties of the Subject, and Settling the Succession of the Crown." The declaration contains an assertion of the rights which the convention "claimed in behalf of the people, and was in consequence called

the bill of rights." De L. Const., *c.* 3, *p.* 50, *note.* "Being now
assembled in a full and free representation of this nation," the con-
vention "claim, demand, and insist upon all and singular the prem-
ises as their undoubted rights and liberties."   In the bill, it is
"enacted that all and singular the rights and liberties asserted and
claimed in the said declaration are the true, ancient, and indubita-
ble rights and liberties of the people of this kingdom." For nearly
two hundred years, in England and America, the popular and legal
idea of a bill of rights has been a declaration of rights of subjects
as distinguished from rights of the government.   From this idea
there is a marked departure in the sixth article of the New Hamp-
shire bill, where "the people  . . .  empower the legislature to
authorize" towns and other bodies to support teachers of religion.
The language employed to express this grant of power is in strik-
ing contrast with the rest of the bill, and calls attention to the in-
congruity of a grant in a chapter of reservations.   In a state con-
stitution, "we are to expect a general framework of government.
. . . We shall also expect a declaration of rights for the pro-
tection of individuals and minorities.   This declaration usually
contains the following classes of provisions:—1. Those declaratory
of the general principles of republican government.  . . .  2.
Those declaratory of the fundamental rights of the citizen.  . . .
3. Those declaratory of the principles which ensure to the citizen
an impartial trial, and protect him in his life, liberty, and prop-
erty, against the arbitrary action of those in authority: as that no
bill of attainder or *ex post facto* law shall be passed; that the right
to trial by jury shall be preserved."   Cool. Con. Lim. 34, 35,
36.  "Bills of rights are part of the muniments of freemen, show-
ing their title to protection, and they become of increased value
when placed under the protection of an independent judiciary,
instituted as the appropriate guardian of private right." 2 Kent
Com. 8.

Several years after our constitution went into operation, the
object and legal effect of its bill of rights appeared in the argu-
ments made for and against the adoption of the constitution of the
United States.   One of the principal objections urged against that
instrument was, that it contained no bill of rights.   Many insisted
upon such a provision as a reservation of private rights in limita-
tion of granted powers.   The principal reply was, that because it
is a reservation of something not granted, it is unnecessary.   That
a bill of rights, including a right of jury trial, is a reservation and
not a grant, was a point on which there could be no difference of
opinion.

Jefferson protested against the omission, and hoped there would
be sufficient opposition to obtain a bill of rights as an amendment
declaring freedom of religion and of the press, the right of jury
trial, and immunity from monopolies in commerce, and from a
standing army.   Letter to Dumas, February 12, 1788, in 2 Jeffer-

son's Works (Washington's ed.) 358. "I will now tell you," he writes to Madison, December 20, 1787 (2 *id.* 329, 330), "what I do not like. First, the omission of a bill of rights, providing clearly, and without the aid of sophism, for freedom of religion, freedom of the press, protection against standing armies, restriction of monopolies, the eternal and unremitting force of the habeas corpus laws, and trials by jury in all matters of fact triable by the laws of the land and not by the laws of nations. To say, as Mr. Wilson does, that a bill of rights was not necessary, because all is reserved in the case of the general government which is not given, while in the particular ones, all is given which is not reserved, might do for the audience to which it was addressed; but it is surely a *gratis dictum*, the reverse of which might just as well be said. . . . I have a right to nothing which another has a right to take away; and congress will have a right to take away trials by jury in all civil cases. . . . A bill of rights is what the people are entitled to against every government on earth, general or particular; and what no just government should refuse, or rest on inference."

December 4, 1790, he writes to Noah Webster (3 *id.* 201, 202), "It had become an universal and almost uncontroverted position in the several states, that the purposes of society do not require a surrender of all our rights to our ordinary governors; that there are certain portions of right not necessary to enable them to carry on an effective government, and which experience has nevertheless proved they will be constantly encroaching on, if submitted to them; that there are also certain fences which experience has proved peculiarly efficacious against wrong, and rarely obstructive of right, which yet the governing powers have ever shown a disposition to weaken and remove. Of the first kind, for instance, is freedom of religion; of the second, trial by jury, habeas corpus laws, free presses. These were the settled opinions of all the states,—of that of Virginia, of which I was writing, as well as of the others. The others had, in consequence, delineated these unceded portions of right, and these fences against wrong, which they meant to exempt from the power of their governors, in instruments called declarations of rights and constitutions; and as they did this by conventions, which they appointed for the express purpose of reserving these rights, and of delegating others to their ordinary legislative, executive, and judicial bodies, none of the reserved rights can be touched without resorting to the people to appoint another convention for the express purpose of permitting it."

"A declaration of rights," says Hamilton, "under our constitutions must be intended to limit the power of the government itself. It has been several times truly remarked that bills of rights are, in their origin, stipulations between kings and their subjects, abridgments of prerogative in favor of privilege, reservations of

rights not surrendered to the prince. Such was Magna Charta, obtained by the barons, sword in hand, from King John. Such were the subsequent confirmations of that charter by succeeding princes. Such was the petition of right assented to by Charles the First, in the beginning of his reign. Such, also, was the declaration of right presented by the lords and commons to the Prince of Orange in 1688, and afterwards thrown into the form of an act of parliament called the bill of rights. It is evident, therefore, that, according to their primitive signification, they have no application to constitutions professedly founded upon the power of the people, and executed by their immediate representatives and servants. Here, in strictness, the people surrender nothing; and as they retain everything, they have no need of particular reservations. 'We, the people of the United States, to secure the blessings of liberty to ourselves and our posterity, do ordain and establish this constitution for the United States of America.' This is a better recognition of popular rights than volumes of those aphorisms which make the principal figure in several of our state bills of rights. . . . Bills of rights, in the sense and to the extent they are contended for, are not only unnecessary in the proposed constitution, but would even be dangerous. They would contain various exceptions to powers not granted, and on this very account, would afford a colorable pretext to claim more than were granted. For why declare that things shall not be done, which there is no power to do? Why, for instance, should it be said that the liberty of the press shall not be restrained, when no power is given by which restrictions may be imposed? I will not contend that such a provision would confer a regulating power; but it is evident that it would furnish, to men disposed to usurp, a plausible pretence for claiming that power. . . . This may serve as a specimen of the numerous handles which would be given to the doctrine of constructive powers, by the indulgence of an injudicious zeal for bills of rights." The Federalist, No. 84. "We have no bill of rights. . . . The enumeration was designedly omitted, because unnecessary, and tended to weaken if not endanger those unnoticed." *People* v. *Morris*, 13 Wend. 325, 328.

It was universally understood by the founders of our institutions that jury trial, and the other usual provisions of bills of rights, were not grants of rights to the public body politic, but reservations of private rights of the subject, paramount to all governmental authority; and this constitutional principle has never been abandoned. 1 Ell. Deb. 328, 331, 332, 381, 498, 503, 504; 2 *id*. 399, 401, 435, 436, 437, 453, 454, 488, 489, 515, 540, 550; 3 *id*. 150, 246, 316, 317, 444–451, 461, 462, 466, 467, 544, 620, 657, 658; 4 *id*. 142, 143, 148, 149, 151–154, 163, 167, 168, 210, 242, 243, 244, 315, 316, 336; 5 *id*. 538, 566; 1 Writings of Madison 423–427; 2 Madison Papers 644; 3 Madison Papers 1565, 1566; 3 Writings of Gouv. Morris 267; 9 Sparks Life of Wash-

ington 269, 279, 280, 544, 546; 2 Marshall Life of Washington 166; Wirt Life of Henry 303, 304, 305, 315; Essex Result, in Life of Parsons, 359, 367, 374; Mass. Convention of 1788 upon Fed. Const. 25, 194, 233, 265; Mass. Const. Convention of 1820, *p.* 199; N. Y. Const. Convention of 1821, *p.* 171, 172; 2 Curtis Hist. U. S. Const. 522; 1 Sto. Const., *s.* 304; 2 *id., ss.* 1768, 1779, 1780, 1782, 1789; 2 Kent Com. 1–13; Pom. Const. Law, *ss.* 227–230, 238; Cool. Con. Lim. 35, 36, 256; Sedg. Stat. Law 408; *Sharpless* v. *Philadelphia*, 21 Pa. St. 147, 161; *Atkins* v. *Randolph*, 31 Vt. 226, 233.

The right of jury trial was reserved here in 1784 because, for centuries, in this and the old country, it had been, not a protection of the government, but a protection of the subject against the government, and of the weak subject against the powerful subject. The meaning of the bill of rights is largely a matter of historical fact. Its historic meaning agrees with the ordinary and natural sense of its language, which is distinctly brought out by an isolated grant, written in the express terms of a grant. As a matter of legal signification, shown by history and by every relevant rule and reason of interpretation, jury trial is no more a constitutional right granted to the state than is the right of religious belief and worship, *habeas corpus*, freedom of the press, or immunity from general warrants, compulsory self-crimination, trial after acquittal, retrospective legislation, unauthorized taxation, and excessive bail. It is a security, not for the sovereignty, the independence, or the public property of the state, but for private life, private liberty, and private property against all power, public and private.

The distinctive character of our bill of rights as the first chapter of constitutional law in which the people, as the original sovereigns, before delegating certain public powers in the second chapter, reserve for themselves, as subjects of their collective body politic, certain rights which they do not give to that body, is illustrated in a criminal case in which the defendant moved for a change of venue, and the state, as the plaintiff in the suit, contended that the change would be unconstitutional. "As the right of trial by a jury *de vicineto*, or of the *visne* or neighborhood, was given for the protection of the subject, so the power was early given to the court of king's bench, for the protection also of the subject, to remove the venue upon a suggestion duly supported that a fair and impartial trial cannot be had. . . . 'At common law, when a fair and impartial trial cannot be obtained, and the indictment has been removed into the king's bench by *certiorari*, the court have a power of directing the trial to take place in the next adjoining county when justice requires it.' . . . This rule of the common law, securing to the subject the right of trial, in criminal prosecutions, in the vicinity where the facts happen, as a protection to him against the power of the king, the framers of

our constitution undertook to embody in that instrument as a protection to the citizen against the power of the state. . . . This provision is not prohibitory of a trial of an offence in any other county than that in which it happened. . . . It is merely declaratory of the sense of the people, that in a criminal prosecution it is the right of the accused to require the charge to be proved in the vicinity or neighborhood where the fact happened. . . . The object of the framers of the constitution . . . was to protect the subject against an unfair trial at a distance from the vicinity of the alleged crime, and at a place selected by officials who might be hostile to the accused. . . . The benefit of statutory and constitutional provisions, both in civil and criminal jurisprudence, may be waived by a party interested. . . . It is the respondent's privilege to be tried in the county where the offence was committed. This provision in our bill of rights, designed for the protection of the accused, was regarded by the framers of the constitution as a privilege of the highest importance, because it would prevent the possibility of sending him for trial to a remote county, at a distance from friends, among strangers, and perhaps among parties animated by prejudices of a personal or partisan character. . . . But they did not intend to destroy his common-law right to a change of venue whenever a fair and impartial trial could not be had in the county where the fact happened. The purpose of this constitutional provision was the protection, not the destruction, of individual rights. The constitutional provision is an affirmance of the prisoner's common-law right not to be tried at a distance from the county in which his offence is charged; and this common-law and constitutional right he may waive for the purpose of securing the fair trial which the constitution guarantees." *State* v. *Albee*, 61 N. H. 423, 425–429.

In that case, the defendant's right to be tried by a Cheshire jury, being reserved for his protection, did not subject him to a risk of conviction in a county where he could not be fairly tried. Trial by peers, like trial in Cheshire, was one of the defendant's, and not one of the plaintiff's, constitutional rights. In many cases there is no constitutional right of jury trial on either side. In many others, one party has, and his adversary has not, that right. On an indictment for murder in the first degree, the prohibition of "any law that shall subject any person to a capital punishment . . . without trial by jury" (art. 16) is a protection of the accused, and not of the plaintiff. And generally in an ordinary civil suit at common law,—a writ of entry, an action of trespass, assumpsit, debt on a recognizance or official bond,—brought by the state against an individual, the defendant is, and the plaintiff is not, constitutionally entitled to a jury trial. The provision of art. 20, that, except in certain cases, "the parties have a right to trial by jury" "in all controversies concerning property, and in all suits between two or more persons," like every other clause appro-

priately included in a bill limiting the sovereign powers granted in the second part of the constitution, is a reserved protection of private rights of subjects, and not a granted protection of those powers, or of the public right of the state to property acquired by the state's exercise of those powers.   This point was settled in the Dartmouth College case, where the college contended that the reconstruction act of 1816 was a violation of articles 15 and 20 (Farrar's Report 55, 146, 148), and where it was held that "the clauses   .   .   .   upon which the plaintiffs' counsel have relied were most manifestly intended to protect private rights only."   1 N. H. 120.   The case turned on the distinction between private rights and public ones.   On a federal question, our judgment was reversed.   4 Wheat. 518.   And the opinion that the title of the college property is public in such a sense as to be conveyable by legislative grant, may not be a true view of New Hampshire law. But no error has been shown in the decision that the constitutional guaranties of jury trial were intended to protect private rights only.

The exception of "cases in which it has been heretofore otherwise used and practised" (art. 20) is neither a reservation nor a grant of the right of jury trial in any case, but an exception of cases in which the right is not reserved.   The essentials of that method of adjudication (41 N. H. 550, *State* v. *Hodge*, 50 N. H. 510, 522, *Copp* v. *Henniker*, 55 N. H. 179, 193–202), and the cases in which it had been otherwise used and practised (*Backus* v. *Lebanon*, 11 N. H. 19, 26, 27, *Baker* v. *Holderness*, 26 N. H. 110, *Petition of Mt. W. Road Co.*, 35 N. H. 134, 142, *Cocheco M. Co.* v. *Strafford*, 51 N. H. 455, 457, Smith, N. H. 449, 450, *Patrick* v. *Cowles*, 45 N. H. 553, 555, *Perkins* v. *Scott*, 57 N. H. 55, 81, 82, *Bellows* v. *Bellows*, 58 N. H. 60) are shown by common-law principles and by history.   But a privilege reserved by the voters in town-meeting as grantors, for the protection of themselves and other subjects against fellow-subjects, and against the public in every form of its governmental organization, and not granted to the state by popular vote, cannot be shown by history, or statute, or usage, to be a constitutional right of the state.   In no case does the bill of rights grant a right of jury trial; it reserves this right for subjects only, and not for them in cases in which it was not their right before the reservation was made.   As this is a point on which the historical test agrees with all other methods employed by the law in ascertaining the meaning of the bill, it is useless to inquire whether, at the date of the reservation, the legislature had given the defendant a jury trial in a traveller's action against the state or against any of those municipal parts of the state that are protected by no other constitutional bulwarks of procedure than those which protect the whole state.   A constitutional convention could have proposed this clause: "The state and each of its territorial divisions shall have a right to trial by jury."   As no convention

has proposed such a grant, the people have had no opportunity to make it. There is no express provision of the kind, nor anything from which it can be implied. The imposition of jury trial by the legislature as a condition on which the state allowed itself, or a municipal or territorial section of itself, to be made defendant in such a suit as this, would be no part of the grant of public rights made by the people to the whole or any portion of the body politic when they formed themselves into that body by adopting the constitution.

If the province and state of New Hampshire had always given a traveller a statutory action against itself for damage happening to him by reason of a defect in a highway, and had always given him a statutory right to try his case by jury, the state would have no constitutional right to that mode of trial in such a case. The statute would be evidence of an understanding, not that the right of jury trial, which the legislature granted to or imposed upon either party, was granted to the state by the constitution, but that this mode of trial had not been prohibited in such a case by a provincial or state law higher than the statute. By a statutory repeal, the state could discontinue its liability. *Beers v. Arkansas*, 20 How. 527; *Railroad Co.* v. *Tennessee*, 101 U. S. 337, 338; Sedg. Stat. Law (2d ed.), Pomeroy's note. Its right to a jury trial, or any other method of adjudication, when it is a defendant in its own courts, is not saved in the bill of reserved private rights, but is a consequence of that immunity from suit which is an incident of sovereignty. *Briscoe* v. *Bank*, 11 Pet. 257, 321. As a jury trial, when not a constitutional right of either party in a suit between individuals, may be given by the legislature, subject to such limitations and qualifications as appear to them expedient and just (*Perkins* v. *Scott*, 57 N. H. 55, 82), so when the state, by an act of its legislature, allows itself to be a defendant in a suit which could not be maintained without its permission, it may prescribe the mode of trial. The plaintiff, accepting the grant of a right of action as a gift, accepts it with the form of action and the modes of procedure and adjudication which the defendant has chosen to annex to the grant.

"It is an established principle of jurisprudence in all civilized nations that the sovereign cannot be sued in its own courts, or in any other, without its consent and permission; but it may, if it thinks proper, waive this privilege, and permit itself to be made a defendant in a suit by individuals, or by another state. And as this permission is altogether voluntary on the part of the sovereignty, it follows that it may prescribe the terms and conditions on which it consents to be sued, and the manner in which the suit shall be conducted, and may withdraw its consent whenever it may suppose that justice to the public requires it." *Beers* v. *Arkansas*, 20 How. 527, 529; 1 Aust. Jur. (3d ed., 1879) 295, 296.

The declaration, in the seventh amendment of the federal con-

stitution, that " In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved," is a reservation made by the people as grantors, and not a grant to the United States of a right of jury trial in suits which the federal government allows to be brought against itself in the court of claims. In that court there is no jury trial because the federal sovereign has prescribed a different mode of proceeding as one of the conditions on which it volunteers as defendant. U. S. Rev. St., *ss.* 1049–1093; *Bonner* v. *U. S.*, 9 Wall. 156, 159; *Langford* v. *U. S.*, 101 U. S. 341, 344, 345. In that court trial by jury would be a condition imposed on the plaintiff by congress, and not a right reserved for either party by the seventh amendment.

For the purpose of the present inquiry, the state of New Hampshire is no less a sovereign than the United States. In the federal courts, a state is a party only by its assent to a granting clause of the federal constitution, or by some other exercise of its will. In its own courts it cannot be made an involuntary defendant. It is not constitutionally bound to give to its school-teachers, to those who support its paupers, lend it money, sell it real or personal property, or make and repair its roads and buildings, to travellers injured by defects in its highways, or to any class of contractors, creditors, or claimants, a right of action, civil or criminal, against itself. If it makes a gift of such a right, it may prescribe the remedy. However it may be when the state prospectively creates, between other parties, rights of action unknown to the common law, in suits brought against the state by its permission the constitution does not deprive the defendant of the privilege which necessarily belongs to every donor of annexing conditions to his gift. If an individual voluntarily offered to pay all damages awarded against him by a referee for injuries happening to travellers by reason of a want of repair in a certain highway, a traveller, claiming damages under the donation, would not be entitled to the verdict of twelve jurors on the questions which the donor had elected to submit to one arbitrator. The rights asserted by the claimant in such a case would not be protected by the palladium of jury trial reserved in the constitution. On the constitutional question, it is not material whether the donor is a subject or a sovereign. It is not necessary in this case to examine the legal nature of a plaintiff's right to a mode of procedure which he cannot have except by leave of the defendant. As a privilege of the defendant in an action against the state, trial by jury is derived from the non-suable character of the public, and not from any clause of the constitution reserving or granting a right to a particular mode of procedure.

II. In this traveller's highway suit against a town, do the defendants occupy the position of a party defending private rights for which the bill of rights reserves jury trial as a fence against

wrong, or the position of a party defending public rights for which that protection is not granted in either chapter of the constitution? The plaintiff sets up a right of action, given him by the public against itself, upon a general obligation which the public has by statute voluntarily assumed, and which it can terminate by repeal. The people, by an act of their legislative agents, have undertaken to keep their highways in a condition suitable for the travel upon them. In pursuance of their general system of local government, they have taken this service upon themselves in their municipal capacity, as a number of parts into which, for this and other public purposes, they have seen fit to divide their body politic by geographical lines. The plaintiff claims compensation out of public property for an alleged failure of the public to furnish for travellers' use such a highway as it undertakes to provide. The public contends that the plaintiff is entitled to no payment from the public treasury under the highway law. The controversy is concerning property that is public in every legal sense that is relevant on the constitutional question. For all the purposes of this question, the rights maintained by the defence of the action are public, as they would be if the suit were brought, under the state's permission, against the whole state, or, under federal permission, against the United States. The public character of these rights does not depend upon the territorial extent of the public body politic to which the people, by their own vote or a vote of their legislative agents, delegate a power and a duty of government, and against which they allow suits to be brought for the non-performance of that duty. Nor is it material, in this case, whether they allow such suits to be brought and tried in a special court of claims, or in a court of general jurisdiction where other actions, civil and criminal, are entered and prosecuted by the public as plaintiff.

"On the 26th day of June, 1871, the superintending school-committee of Concord, after due notice to the parties, and hearing, decided upon a location for a new school-house in" school-district No. 13. "As the law stood at that time, this decision of the school-committee was to be binding and conclusive upon all parties for the term of five years. Gen. Sts., c. 233, s. 6. July 14, 1871, an act passed the legislature providing that in case any ten or more voters of a school-district are aggrieved by the location of any school-house by the superintending committee, they may apply by petition to the county commissioners, who shall hear and determine the location thereof. It is further provided, in section 3, that the act shall apply to cases where school-houses have already been located by the school-committee, as well as to cases where such location shall hereafter be made. . . . The petitioners contend that the act of July 14 is unconstitutional. . . . What is the nature of the rights said to be invaded by the act? Clearly, they can only be (1) such as pertain to the school-district, as a

district by virtue of its corporate existence, and (2) such as pertain to the individuals composing the district, as individuals by virtue of this membership; for the act affects no right of property and no privilege or immunity except such as depend upon the permanence of the location of the school-house, as fixed by the school committee, for the period of five years. . . .

"School-districts . . . are, and always have been, public corporate bodies, created by the legislature as a means and instrument in carrying out the public duty in reference to public instruction laid upon the legislature by the constitution. They exist only by authority derived from the legislature; their powers, duties, and obligations are such, and such only, as are derived directly from legislative enactment; and even after they have been created and invested with all the rights, privileges, and powers incident to such corporations, . . . the legislature may, without infringing any constitutional obligation or any right partaking at all of the nature of a contract, put an end to their corporate existence, and so, of course, strip them, as well as the inhabitants composing them, of all the rights, privileges, and powers they before possessed. . . . It would seem to follow that the inhabitants of a school-district have no rights in the existence or in any of the corporate functions of the district, which can be regarded as vested rights, or which can be set up as beyond legislative control. The authority of the legislature in the premises being supreme, any such vested rights in the district as a body, or in the inhabitants composing it as individuals, would be inconsistent with that authority in the legislature, and hence cannot exist. . . .

"*Merrill* v. *Sherburne*, 1 N. H. 199, and *Towle* v. *The Eastern Railroad*, 18 N. H. 547, . . . merely enunciate the familiar doctrine that private rights which have become vested cannot be taken away or destroyed by the legislature; and that the legislature cannot exercise judicial powers by granting a new trial of a civil cause between private parties." The act of 1871 " unsettled locations which the law before made conclusive for five years, and granted another hearing before a different tribunal in a matter once put at rest by the judgment of a tribunal which, at the time of the judgment, was invested with final jurisdiction in the premises. But we think the answer to these objections, which at first view appear so formidable, is found in the nature of the rights affected by the act. School-districts being *quasi* corporations, like towns, called into existence by the legislature as instruments in the plan of public instruction, all their functions are of a public character; their property is public property; all the rights of their inhabitants, which come from the corporate existence of the district, are essentially political. That such public corporations, deriving their existence, and all their powers, privileges, and rights, from the legislature, and charged with all their duties and obligations, by the same superior power, are subject to legislative control, has

been so often decided by the courts, and is so generally laid down in all the books, that the doctrine may be regarded as quite elementary. . . . With this view it is not necessary to go further into the inquiry what rights are to be regarded as vested in such a sense as to come within the protection of the constitution against legislative encroachment. In general, they will be found to be private rights relating to property,—one leading object for which the constitution was established being the protection of private property." *Farnum's Petition,* 51 N. H. 376–380, 383.

By the general retrospective act, the validity of which was contested in that case, the legislature could grant new trials, because the rights affected by the act were public. The public character of the school-district and its property was decisive on the constitutional question, without regard to the practice before 1784. Article 23 in the list of reserved private rights was not a protection of the district against the retrospective operation of the act, as it would not have been if the district had been the whole state. And such municipal members of the sovereign body politic are no more protected by the exemption from judgment without jury trial, reserved for subjects by articles 15, 16, and 20, than by the exemption from retrospective legislation, reserved for subjects by article 23. Articles 20 and 23 could be understood in a sense broad enough to include the sovereign as a party protected by them in civil suits, if they could be severed from the context, and read without reference to the nature and purpose of the document. The legal meaning of article 20, so far as it is material in this case, is settled by the method of construction applied to article 23 in *Farnum's Petition.*

The doctrine, that the purpose of the creation of municipal corporations by the state is to exercise a part of its powers of government, is universally recognized. *Hill* v. *Boston,* 122 Mass. 344, 380. A city is only a political subdivision of the state, made for the convenient administration of the government. It is an instrumentality, with powers more or less enlarged according to the requirements of the public. *New Orleans* v. *Clark,* 95 U. S. 644, 654; *Payne* v. *Treadwell,* 16 Cal. 220, 233. Counties are subdivisions of the state, in which some of the powers of the state government are exercised by local functionaries for local purposes. *State* v. *St. Louis,* 34 Mo. 546, 570, 571. Counties are nothing more than certain portions of territory into which the state is divided for the more convenient exercise of the powers of government. They form together one political body in which the sovereignty resides. *Maryland* v. *B. & O. R. Co.,* 3 How. 534, 550. The law regards municipal corporations as agents and instruments of the state for the exercise of a portion of its governmental functions in a certain district. Pom. Const. Law, *s.* 587; *Sharswood,* J., in *Philadelphia* v. *Fox,* 64 Pa. St. 169; *Field,* J., in *Blanding* v. *Burr,* 13 Cal. 343. The municipal government is really but a branch of the state. *Durach's*

*Appeal*, 62 Pa. St. 491, 494; *Barnes* v. *District of Columbia*, 91 U. S. 540, 544; *Fowle* v. *Alexandria*, 3 Pet. 398, 409; *Mayor* v. *Board of Police*, 15 Md. 376, 462; *Talbot Co.* v. *Queen Anne's Co.*, 50 Md. 245; *Trustees* v. *Tatman*, 13 Ill. 27, 30. A public corporation is one that is created for political purposes with political powers, to be exercised for purposes connected with the public good in the administration of civil government,—an instrument of the government, subject to the control of the legislature. *Regents* v. *Williams*, 9 G. & J. 365, 397; *Sloan* v. *State*, 8 Blackf. 361, 364. A public corporation is the embodiment of political power for the purposes of public government. *People* v. *Mayor*, 25 Wend. 680, 684. A municipal corporation, while nominally a person, is virtually a political power, a constituent element of one sovereignty, and its local legislation and administration are the legislation and administration of the state. *Louisville* v. *Com.*, 1 Duv. 295, 297. As it is a portion of the sovereign power of the state, it is not subject to federal taxation of its municipal revenues. *U. S.* v. *R. R. Co.*, 17 Wall. 322, 329, 332. Its property is exempted from state taxation, because, like the property of the state, it is public. *Worcester Co.* v. *Worcester*, 116 Mass. 193; *Louisville* v. *Com.*, 1 Duv. 295. The charter of a town is not a contract, because there is but one party. *People* v. *Pinckney*, 32 N. Y. 377, 395; *Conner* v. *Bent*, 1 Mo. *235, *238; *Mills* v. *Williams*, 11 Ired. 558, 562; *Erie* v. *Erie Canal Co.*, 59 Pa. St. 174, 177; 2 Kent Com. 305; *Weeks* v. *Gilmanton*, 60 N. H. 500. Towns are "component parts of the state, and aggregately taken are the state." Smith's Argument in the Dartmouth College case, Farrar's Report 113.

The legislature, therefore, has entire control over municipal corporations, to create, change, or destroy them at pleasure, and they are absolutely created by the act of incorporation, without the acceptance of the people or any act on their part, unless otherwise provided by the act itself. *Berlin* v. *Gorham*, 34 N. H. 266, 275; *Jersey City* v. *R. R. Co.*, 20 N. J. Eq. 360, 365, 366; *Governor* v. *McEwen*, 5 Humph. 241, 288, 289; Ang. & A. Corp., *s.* 767; Field Corp., *s.* 36. The sovereign has the same right to change the limits of counties that a farmer has to divide his plantation into fields and make cross fences where he chooses. *Mills* v. *Williams*, 11 Ired. 558, 562. Political power conferred on municipal subdivisions can never become a vested right as against the government. *People* v. *Morris*, 13 Wend. 325. Public corporations are political corporations, or such as are founded wholly for public purposes, the whole interest in which is in the public; and they may be altered or abolished by the legislature. *Ten Eyck* v. *D. & R. C. Co.*, 3 Harrison 200, 203; *Barnes* v. *Dist. of Col.*, 91 U. S. 540; cases cited in 9 U. S. Dig. 407. While the state may make with a municipal corporation a contract protected by the federal constitution, and such corporation, as trustee, may acquire rights in property of which the equitable owners cannot be divested

by the legislature (*Grogan* v. *San Francisco*, 18 Cal. 590, 612–615, *Richland* v. *Lawrence*, 12 Ill. 1, 8, *Terrett* v. *Taylor*, 9 Cranch 52, Smith, N. H., 448, *Bristol* v. *New Chester*, 3 N. H. 524, 535, *Chapin* v. *School District*, 35 N. H. 445, *Attorney-General* v. *Dublin*, 38 N. H. 459, *Greenville* v. *Mason*, 53 N. H. 515, *Sargent* v. *Cornish*, 54 N. H. 18, *Spaulding* v. *Andover*, 54 N. H. 38, 2 Sto. Const., *s.* 1391), municipal property held for public municipal purposes is public property subject to legislative control (*Hart* v. *Burnett*, 15 Cal. 530, 575, 612, 616, *Payne* v. *Treadwell*, 16 Cal. 220, 222, 233–237), provided the property is not diverted from the uses and objects for which it was given or purchased. *Trustees* v. *Tatman*, 13 Ill. 27, 30. Over towns and their public property, the power of the legislature is supreme. Sedgwick St. & Const. Law 582, *n.*; Wade Retroactive Laws, *s.* 22. Acts of the legislature are not within the prohibition of retrospective legislation unless they operate on the interests of individuals or of private corporations. *Merrill* v. *Sherburne*, 1 N. H. 199, 213. The legislature, in incorporating a municipality, does not divest itself of any powers over its inhabitants which it possessed before the charter was granted. *Laramie* v. *Albany*, 92 U. S. 307, 308.

" Public corporations are those which are created for public purposes, and whose property is devoted to the objects for which they are created. The corporators have no private beneficial interest, either in their franchises or their property. The only private right which individuals can have in them is the right of being and of acting as members. Every other right and interest attached to them can only be enjoyed by individuals, like the common privileges of free citizens and the common interest which all have in the property belonging to the state. Counties, towns, parishes, &c., considered as corporations, clearly fall within this description. A corporation, all of whose franchises are exercised for public purposes, is a public corporation. . . . Whether a corporation is to be considered as public or private, depends upon the objects for which its franchises are to be exercised. . . . The legislature has a most unquestionable right to compel individuals to become members of public corporations. Thus, when a town is incorporated, all the inhabitants become members of the corporation, and continue members so long as they reside within its limits, whether they consent or not." *Dartmouth College* v. *Woodward*, 1 N. H. 111, 116, 117, 125. If the college had been a public corporation like a town, and its property had been public in the sense in which town funds raised by taxation are public, the judgment of this court in that case would not have been reversed. 4 Wheat. 518, 629, 630, 632, 635, 665, 669, 694.

" Public corporations are such as are created by the government for political purposes, as counties, cities, towns, and villages; they are invested with subordinate legislative powers, to be exercised for local purposes connected with the public good; and such pow-

ers are subject to the control of the legislature of the state. . . .
In respect to public or municipal corporations, . . . the legis-
lature, under proper limitations, have a right to change, modify,
enlarge, restrain, or destroy them, securing, however, the property
for the use of those for whom it was purchased." 2 Kent Com.
275, 305. All corporations, says Story, created for public pur-
poses only, as cities and towns, are strictly public corporations.
There is no doubt they are subject to legislative control, with this
limitation, that property held by them shall still be secured for
the use of those for whom and at whose expense it has been ac-
quired. The reason is, that it is only a mode of exercising public
rights and public powers for the promotion of the general interest;
and therefore it must, from its very nature, remain subject to the
legislative will, so always that private rights are not infringed. 2
Sto. Const., *s.* 1393. The distinction is between public rights and
private ones.

When public property is taken from a public corporation by
public authority, the benefit of its value cannot be diverted from
those for whom and at whose expense it was acquired by taxation
or otherwise. In this state, this limitation of legislative control is
imposed by the reservation of private rights requiring equal taxa-
tion, and correlation of taxation and protection. Bill of Rights,
arts. 1–3, 10, 12; *Bowles* v. *Landaff*, 59 N. H. 164, 192; *Berlin
Mills Co.* v. *Wentworth's Location*, 60 N. H. 156; *State* v. *Express
Co.*, 60 N. H. 219, 250, 251. The proviso on this point, stated in
the authorities (substantially in the form given by Kent and Story)
without the further restriction comprised in a right of jury trial,
excludes any such limitation as the inability of the legislature to
provide for the decision of questions of fact in relation to public
property and public rights by any other tribunal than a jury. The
conspicuous place given by the authorities to one limitation, and
their omission to assert the other, show that the latter does not
exist.

A town may abolish its school-districts, and take their public
property, securing the benefit of its value to the proper persons
by the exercise of judicial and administrative powers vested in
town officers. G. L., *c.* 86, *ss.* 2, 3. In this way a municipality
may be deprived of its corporate life and its public property,
against a unanimous vote of its members, and without a jury trial
of the question of the value of its property. This judicial question
may be decided by some other tribunal than a jury, not because
the case is one of private rights within the exception of article 20
in relation to preconstitutional usage, but because the property is
public. The case of school-districts is not one in which it had been
" otherwise used and practised" before 1784. *School District* v.
*Sherburne*, 48 N. H. 52, 55. And if the question of the value of
public property taken from a public corporation by public author-
ity had always been determined by a jury, that mode of judication

would not be preserved by the reservation of the right of jury trial for the protection of private rights.

" The public property of a county does not belong to it in the same absolute sense as the property of an individual belongs to him, but is held by it as a subordinate part of the government, for public uses, and subject to the authority of the legislature, upon changing the boundaries of the county, to transfer or apportion it to or among the counties as newly constituted, for the same uses. Such apportionment may either be made by the legislature itself, or may be intrusted by it to the judicial department, to be carried out through the instrumentality of commissioners or otherwise as the legislature may prescribe; and neither county is entitled as of right to a trial by jury upon the question." *Stone* v. *Charlestown,* 114 Mass. 214, 224.

The legislature may divide a town, and cause a division to be made of its public property and public debts and burdens, without jury trial, without the consent of the town, and without the consent of the new towns to whom parts of the public property, debts, and burdens are assigned. *Bristol* v. *New Chester,* 3 N. H. 524; *Londonderry* v. *Derry,* 8 N. H. 320; *N. Yarmouth* v. *Skillings,* 45 Me. 133; *Montpelier* v. *East Montpelier,* 29 Vt. 12, 19; *Laramie* v. *Albany,* 92 U. S. 307; *Mt. Pleasant* v. *Beckwith,* 100 U. S. 514; *Warren* v. *Charlestown,* 2 Gray 84, 104. The legislature may require a county to pay a certain portion of the public expenses of a city situated within its limits. Such an act is not an appropriation of private property to public use, does not impair the obligation of a contract, and, as it does not disturb any private, vested right, is not retrospective. County funds are not private property. They are the property of the state, acquired by taxation from the people and the property in the county; and the legislative power of the state determines to what local uses such funds shall be applied. *State* v. *St. Louis,* 34 Mo. 546, 570, 571; *St. Louis* v. *Sheilds,* 52 Mo. 351, 354; 1 Dill. Mun. Cor., s .61, n. The legislature may direct a particular bridge to be built at the expense of a certain municipality. *Com.* v. *Newburyport,* 103 Mass. 129; *Carter* v. *Cambridge,* 104 Mass. 236; *Att'y Gen.* v. *Cambridge,* 16 Gray 247. In *Kirby* v. *Shaw,* 19 Pa. St. 258, it was held that equality of taxation was not required by the constitution, and that the legislature might impose upon a particular shire town more than its proportion of the expense of a county court-house and county jail built thereon. In a subsequent case, *Dunmore's Appeal,* 52 Pa. St. 374, the principle of *Kirby* v. *Shaw* was affirmed, and a statute apportioning a town debt between subdivisions set off into separate municipalities was declared constitutional.

Not only may the legislature cause the property and obligations of a municipality to be apportioned without a jury trial; it may also take away accrued benefits, by remitting fees, fines, and penalties. The legislature may discontinue a toll ferry which it

has granted to a town, though it cannot revoke that discontinuance to the injury of the private rights of a competing bridge company. *Hartford Bridge Co.* v. *East Hartford,* 16 Conn. 149; *East Hartford* v. *Hartford Bridge Co.,* 17 Conn. 79—10 How. 511, 534, 540; *Trustees* v. *Tatman,* 13 Ill. 27. The Hartford case is especially instructive, as it brings the legislative power over property belonging to a town in contrast with the lack of legislative power over similar property not public in title, although devoted to the public use by a highway corporation. A penalty or forfeiture incurred under a statute by an individual for the benefit of a particular county may be released or remitted by the legislature after the forfeiture has accrued, because the county is one of the constituent elements of the state, and the money, if received by the county, would belong to it in its public political capacity, as public property. *State* v. *B. & O. R. Co.,* 12 G. & J. 399, 436, 438—3 How. 534. The right of a county to a fine imposed in a criminal case may be defeated by a pardon of the convict. The county has no vested right in the fine, because it is a public corporation. But the right to the costs of prosecution to which individuals are entitled is a vested private right which cannot be released by pardon. *Holliday* v. *People,* 5 Gilm. 214, 216; *Cope* v. *Com.,* 28 Pa. St. 297, 303; *Com.* v. *Denniston,* 9 Watts 142; *Schuylkill* v. *Reifsnyder,* 46 Pa. St. 446; *Duncan* v. *Com.* 4 S. & R. 449; *Rowe* v. *State,* 2 Bay 565; *Ex-parte M'Donald,* 2 Whart. 440. The right of an individual to a penalty incurred under a statute cannot be taken away by a repeal of the statute (*Dow* v. *Norris,* 4 N. H. 16, *Lewis* v. *Foster,* Smith, N. H., 420, 428, *n.*), though the right of the state to such a penalty may of course be taken away by repeal; and the authorities are unanimous that the right of a public corporation may be taken away in the same manner. *Coles* v. *County of Madison,* Breese 155, 160, was an action of debt brought by the defendant against the plaintiff in error for a penalty given by statute. The county obtained a verdict, but before judgment the legislature passed an act releasing all penalties incurred under the statute, and it was held that the releasing act was constitutional. One ground upon which the decision was put was the legislative control of corporations purely public. In *Conner* v. *Bent,* 1 Mo. *235, a municipal corporation had recovered a judgment against the plaintiff for municipal taxes collected by him; the legislature released him from the judgment; and the release was held valid on the ground that the corporation was public, and its property was subject, like that of the state, to legislative control. In *Bush* v. *Shipman,* 4 Scam. 186, 190, it was held that the legislature might authorize payments to a school fund in bills of a state bank. The decision was based upon the doctrine of the Dartmouth College case, that, while private interests are protected by many constitutional provisions, both state and national, the legislature, as trustee of the public interest, has the power to regulate and control public corporations.

"The state board of audit was constituted by chapter 444 of the Laws of 1876. By section 2 of that act, the board was to hear all private claims and accounts against the state excepting such as were required to be heard by the canal appraisers, and to 'determine on the justice and amount thereof, and to allow such sums as it shall consider should equitably be paid by the state to the claimants." . . . The act established a court to administer justice between the state and its creditors." *Danolds* v. *The State of New York*, 89 N. Y. 36, 50, 51; *Swift* v. *The State of New York*, 89 N. Y. 52, 66. And as the state, by its legislature, may subject itself to liabilities more equitable than those of a strictly legal nature, and provide some other tribunal than a jury for the decision of both legal and equitable claims against itself as a unit, so, by a general law, it may subject its geographical and political divisions to similar liabilities and similar modes of judicial procedure.

The legislative control established by the authorities over the public property and liabilities of municipalities is incompatible with the constitutional right of jury trial claimed by the defendants in this case. The legislature can create liabilities for public corporations, and appropriate their public money to the satisfaction of claims which have no legal obligation and are founded only in justice. The power of appropriation which it can exercise over the revenues of the state it can also exercise over the revenues of counties and towns, if such revenues are not by law devoted to a special purpose. *Blanding* v. *Burr*, 13 Cal. 343, 350, 351; *Sinton* v. *Ashbury*, 41 Cal. 525. The state may investigate and determine its own indebtedness and may direct the county authorities to ascertain and allow just claims upon the treasury, or may ascertain and fix the amount and direct the county to raise means by taxation for its payment. *Dennis* v. *Maynard*, 15 Ill. 477, 480, 481. In the cases upon the payment of bounties, commutation money, and money paid for substitutes, it was not held that municipal corporations were protected by jury trial. The legislature may require a municipality to pay certain claims which are equitable only, and not legally binding. *State* v. *Flanders*, 24 La. An. 57, 61; *Cleveland* v. *Board*, 38 N. J. Law 259, 265; Cool. Con. Lim. 230, *note*; Cool. Tax. 91, 479. A law requiring a municipal corporation to pay a demand, which is without legal obligation but which is equitable and just in itself, being founded on a valuable consideration, is not a retroactive law. *New Orleans* v. *Clark*, 95 U. S. 644, 654. A statute obliging a· city to compensate private persons for the value of property destroyed by a mob is constitutional. *Darlington* v. *Mayor*, 31 N. Y. 164; *Fauvia* v. *New Orleans*, 20 La. An. 410; *In re Pennsylvania Hall*, 5 Pa. St. 204. Although the legislature cannot, in the case of private rights, grant a new trial or exercise ordinary judicial power, it may, as against a county, by special act for the relief of its treasurer, direct the opening and resettlement of his accounts by county auditors, so as to allow him

a sum due on equitable and not on legal grounds; because a county is a public corporation subject to the control of the state. *Burns* v. *Clarion Co.*, 62 Pa. St. 422, 425. In *Lycoming Co.* v. *Union Co.*, 15 Pa. St. 166, 170, a special statute was held constitutional which provided that counties from which, under a statute, causes had been removed for trial to another county should reimburse the latter the expenses thereby incurred by it; the amount payable by each county to be determined by the judges of the county to be reimbursed. In *Guilford* v. *Supervisors*, 13 N. Y. 143, it was held,— (1) That the legislature has power to levy a tax upon the taxable property of a town and appropriate it to the payment of the claim of an individual against the town; (2) that it is not a valid objection to the exercise of such power that the claim in question is not recoverable by action against the town; (3) that it does not alter the case that the claim has been rejected by the voters of the town, when submitted to them at a town-meeting under an act of the legislature authorizing such submission and declaring that the town's decision should be final and conclusive. In this case (apparently approved in *U. S.* v. *R. R. Co.*, 17 Wall. 322, 329, 332) *Denio*, J., declared that the legislature may appropriate public money to the payment of claims founded not in law, but in equity and justice, in the largest sense of these terms, or in gratitude or charity, or deemed by it to relate to the promotion of the public well-being, of which it is the judge (*p.* 149).

The legislature imposes on municipalities, whether they wish or not, the burden of maintaining highways, and incurring various other expenditures for public purposes. *Philadelphia* v. *Field*, 58 Pa. St. 320; *Erie* v. *Erie Canal Co.*, 59 Pa. St. 174; *Dennis* v. *Maynard*, 15 Ill. 477, 480; *Talbot Co.* v. *Queen Anne's Co.*, 50 Md. 245; *Justices* v. *Holland*, 3 Grat. 247; *Jensen* v. *Polk Co.*, 47 Wis. 298; Cool. Tax. 478; Burr. Tax., *s.* 31; Dill. Mun. Cor., *s.* 43. The legislature may by special act direct the construction of a highway in a particular town, compel the creation of a town debt by the issue of its bonds, and impose a tax upon the town to pay the bonds, without the consent of the town. *People* v. *Flagg*, 46 N. Y. 401. *Church*, C. J., delivering the judgment of the court, in which there was no dissent, says,—"The making and improvement of public highways, and the imposition and collection of taxes, are among the ordinary subjects of legislation. The towns of the state possess such powers as the legislature confers upon them. They are a part of the machinery of state government, and perform important municipal functions, which are regulated and controlled by the legislature. . . . The legislature, in substance, directed certain highways to be made and constructed in the town of Yonkers, and imposed a tax upon the town to pay the expenses of the work; but to prevent too large a tax at one time it directed bonds to be given payable at different periods. . . . If the legislature may authorize this debt, why may it not direct it to be done?

As a question of power, I am unable to find any restriction in the constitution." That case was affirmed in *People* v. *Batchellor*, 53 N. Y. 128, 138–140, where it was held that a town cannot be compelled to contribute to the building of the road of a railway corporation, because it is a private and not a public purpose, the court saying (*p.* 143),—" The test is, whether the purpose to be effected is public or private;—if the former, a mandatory statute is valid; if the latter, . . '. the act is void." See *Sharpless* v. *Mayor of Philadelphia*, 21 Pa. St. 147; *Campbell* v. *Kenosha*, 5 Wall. 194. In *People* v. *Chicago*, 51 Ill. 17, 30—2 Am. Rep. 278, 284, 285—it was held, under special provision of the state constitution, that an act requiring Chicago to incur a certain debt was unconstitutional. But the general legislative power of controlling municipal corporations was expressly declared, and the court illustrated the rule by supposing the case of an insurgent city requiring the interposition of the military power, or failing to furnish, by its police, reasonable security to life and property, in which case the state, it was said, might supply the necessary force and assess the city for the expense.

" The state may establish highways . . . by its own direct action, or it may empower or direct one of its municipal divisions to establish them, or to assist in their construction. . . Counties, cities, and towns exist only for the convenient administration of the government. Such organizations are instruments of the state, created to carry out its will. When they are authorized or directed to levy a tax, or to appropriate its proceeds, the state through them is doing indirectly what it might do directly. It is true the burden of the duty may thus rest upon only a single political division, but the legislature has undoubted power to apportion a public burden among all the tax-payers of the state, or among those of a particular section." *Railroad Co.* v. *County of Otoe*, 16 Wall. 667, 673, 676; *Perry* v. *Keene*, 56 N. H. 514, 545, 546.

Legislation on this subject in New Hampshire, as indeed elsewhere, is commonly of a general character, providing a tribunal for the imposition of the expense of laying out and building highways, and for the apportionment of the expense among towns and counties. G. L., *c.* 68, *ss.* 10–14, *c.* 70, *ss.* 1, 3; *Webster* v. *Alton*, 29 N. H. 369, 383; *Pittsburg* v. *Clarksville*, 58 N. H. 291. The legislature could adopt a different method of apportionment. They could transfer from the state, as a number of municipal bodies, to the state, as one municipal body, the whole duty of laying out, building, and repairing highways, provide for the appointment or election of state agents to perform all the highway service now performed by municipal officers, and apportion among the towns a general state highway tax to defray the expense. When the legislature choose to make a territorial division of this duty and expense, the burden thus assigned to the municipal parts of the state is public, as it would be if retained by the state as a unit; and

the parts, in their severalty, are no more protected against the burden by a constitutional right of jury trial than they would be in the unity of the state.   In this respect, the division of all highway expense, including damages paid to land-owners and travellers, is governed by the same reason, and comes under the same rule.   The legislature, transferring all highway duty and liability from the towns to the state, could provide a court of claims, board of audit, referee, or other tribunal without a jury, for all such travellers' claims as the one made by the plaintiff in this case, pay the damages awarded, and apportion them among the towns, as they now apportion state expenses in the state tax.   Whether the result is reached directly or indirectly, whether the liability is assumed by the state in its divided or its undivided capacity, and whether a town is required to pay damages for its own fault, or for its share of the fault of the whole state, are inquiries that do not affect the question raised in this case.   As the towns have not the constitutional protection of jury trial against unjust legislative distributions of the expenses incurred by the legislature in the support of a normal school, an industrial school, a state prison, an asylum for the insane, and the construction and annual repair of highways among the White Mountains, so they have not that protection against an unjust legislative distribution of other expenses which the legislature may incur, including the support of all schools, paupers, criminals, and highways.   How much the state will employ municipalities as delegates, and how much it will employ other agents, in local administration and the division of public expenses, is a legislative question.   The constitutional right of a town to jury trial as a protection of its tax-payers against such expenses, does not depend upon the extent to which the legislature choose to employ municipal machinery.   As the legislature may authorize some other tribunal than a jury to divide the pauper liability of a divided town (*Sanbornton* v. *Tilton*, 53 N. H. 438, 440, 441), so they may apportion other items of public expense without a jury trial.

In this state, probably more than elsewhere, the people are constitutionally protected against unequal taxation and special legislation.   Many of the authorities we have cited from other jurisdictions may sustain a power more extensive than that of New Hampshire legislation, defined and limited as it is by the established construction of the bill of rights.   They are cited here, not for the purpose of introducing a new doctrine, but in support of a conclusion based on the distinction between private rights protected by the reservation of jury trial, and public rights not protected by that reservation.   However much any of them may differ from the views that prevail in this state in relation to special legislation, unequal taxation, the correlation of taxation and protection, the line between legislative and judicial questions, or other constitutional subjects, the great mass of American authorities on the power of

the legislature over the municipal payment of claims, concur with our own decisions in the recognition of a principle that cannot be reconciled with the right of jury trial claimed by the defendants in this case.    Cool. Con. Lim. 118, 192, 193, 230–240 ; Cool. Tax. 239, 240, 678–703 ; 1 Dill. Mun. Cor., *c.* 4.    They show, first, that the state possesses certain powers over municipalities because the state and its subdivisions are identical in essence, and a private right, not granted or reserved for the state, is not granted or reserved for its municipalities ; and, secondly, no assertion or suggestion being made by court or counsel of a municipal right of jury trial, that the existence of such a right is practically, if not in terms, denied.

In a few cases the latter point has been directly presented for decision, and it has been held that where the legislature exercises its power of imposing burdens on municipalities, the latter are not entitled to a jury trial for the determination of the facts.    In *Borough of Dunmore's Appeal*, 52 Pa. St. 374, four boroughs had at different times been created out of a township, leaving on the remaining part, which continued to be a township, a debt larger than its due share.    A special statute then authorized a just distribution of the debt to be made by commissioners appointed by the court.    It was held that municipal corporations, being creatures of the legislative power, had not a constitutional right of jury trial. This case was approved in *Philadelphia* v. *Fox*, 64 Pa. St. 169, 181.    A similar conclusion was reached *In re Pennsylvania Hall*, 5 Pa. St. 204, where a jury of six had been provided for to assess a loss (for which the city had been made liable) inflicted by a mob. In *Cleveland* v. *Board of Finance*, 38 N. J. Law 259, 265, it was held that the legislature, in providing for the adjustment of equitable claims against a city, might appoint a special tribunal for the purpose in place of a jury.    " In the case of *The People* v. *Haws*, 37 Barb. 440, a motion was made in the supreme court for a mandamus against the comptroller of the city, to compel him to pay the relators a large sum of money, which had been awarded by arbitrators, appointed pursuant to an act of the legislature, to determine what, if anything, they were entitled to receive from the city for the breach of an alleged contract for the building of certain gate-houses in the new reservoir of the Croton water-works.    The corporation had denied the legal existence of the contract, and refused to consummate it, or to allow the relators to do the work, and the legislature thereupon passed the act in question, providing for an arbitration. . . . .    One ground " on which the general term affirmed an order of the special term denying the motion " was that if the relators had a demand against the city, there was a remedy by action, and that where such a remedy exists, a mandamus will not lie.    But the court, moreover, denied the power of the legislature to pass a law obliging the city to submit to an arbitration in such a case.    That position was based upon the constitu-

tional provision protecting private property, relied on by the defendant in the present case. If the transaction were between private persons, I doubt not but that this provision and the one preserving the right of trial by jury would have been fatal to the case. So if the corporation of the city had been a private corporation. But being public, and its charter and corporate franchises being subject to legislative control, I am of opinion that the legislature had a right, of its own authority, to create a board for the adjustment of the claim, without the consent of the city." *Darlington* v. *New York*, 31 N. Y. 164, 203, 204.

In *H. & Q. B. & Turnpike Co.* v. *County of Norfolk*, 6 Allen 353, 357, 358, 360, a statute authorized commissioners appointed by the court to assess the damages to be paid to a turnpike company for making their road a free highway, and to determine in what proportions the damages should be paid by the counties of Norfolk and Plymouth. The county of Norfolk objected to an award which required that county to pay three quarters of the damages. " The first and leading " objection, say the court, " is that the act is unconstitutional and invalid because the legislature, in providing that the amount awarded by the commissioners to the corporation for their road, franchise, and other property, shall be paid by the counties of Norfolk and Plymouth, have assumed to exercise a power in its nature judicial. . . . The gist of this objection, as we understand it, is, that as the effect of this provision is to take and appropriate the money of the county without and against their consent, the legislature should have provided some mode in which the question of the liability of the county to be charged with this expenditure and the extent or proportion in which the burden should be borne by them, if liable at all, should have been determined by a judicial tribunal duly appointed according to the provisions of the constitution, with a right to a trial by jury on all disputed questions of fact, and that the legislature had no power or authority arbitrarily to determine and enact that the county of Norfolk should pay a part of the sum to be awarded for the value of the franchise and property of the turnpike corporation, and to delegate to commissioners a jurisdiction and authority to adjudicate and finally decree the share of such sum which was to be paid by the county." The objection was overruled. *Salem Turnpike* v. *County of Essex*, 100 Mass. 282, is a similar case.

" The legislature of Vermont, in a section of an act to suppress intemperance, had enacted that a county commissioner should be elected, who might appoint an agent for each town to purchase liquors on its account to be kept by the agent for sale for medicinal purposes, and all other selling of liquors was prohibited. One Mann was appointed the agent for the town of Randolph, and in that character purchased liquors of the plaintiff," in *Atkins* v. *Randolph*, 31 Vt. 226, " on the credit of the town, but had betrayed his trust in not paying over the proceeds of the sales made by

him.   The action was brought to recover against the town the price of the liquors so purchased.   The court held the law unconstitutional, as a violation of the provision protecting private property, contained in the bill of rights.   . . . .   The opinion, of course, denies the right of the state legislature to make public regulations binding on the town without the consent of the inhabitants, which involve an obligation to pay money.   It is opposed to the right, invariably conceded here to make such regulations, and stands on no principle.   Its fallacy was exposed in an able dissenting opinion." *Darlington* v. *New York*, 31 N. Y. 164, 204, 205.   In *State* v. *Woodbury*, 35 N. H. 230, it was held that an act requiring selectmen to appoint liquor agents was constitutional, and that selectmen were liable to indictment for refusing to appoint them.   The constitutional objection was raised and argued by counsel who presented those dangers of compelling towns to engage in trade, which seem to have had weight with the Vermont court.   But the power of the legislature to impose upon towns and their officers, against their will, the duty of carrying on a liquor traffic was sustained.

The Vermont court appear to have been moved to a degree of indignation by the operation of the law.   Their decision contains some appeals that might be appropriately addressed to the legislature, but does not contain a clear statement of constitutional principle in conflict with *State* v. *Woodbury*.   That the legislature may compel a town to provide highways, to keep them in repair, and to incur a liability for damage caused by neglect of the latter duty, is a proposition not denied in Vermont.   Between the power of compelling towns to furnish highways suitable for travel and to be liable for furnishing highways not suitable, and the power of compelling them to furnish liquors suitable for medicine and to be liable for the neglect of that duty, no distinction can be made that affects the question before us.   The legislature may compel towns to provide public fountains of water for man and beast. And, for the decision of cases of this kind, the constitution, in its present form, furnishes no legal test based on the difference between public water-works or public parks, and a supply of vaccine matter, alcohol, opium, strychnine, or other drugs deemed necessary for the health of the community.

The objections made in *State* v. *Tappan*, 29 Wis. 664, 687, to legislation imposing on municipalities the duty of paying enlistment bounties, were such that the decision is not an authority on the question in this case.   Here is no question of taxation for a public purpose, equality of taxation, uniformity of law, or legislative exercise of judicial power.   Arbitration, accepted by general law, in this class of cases, as a mode of ascertaining and defending public rights of property, is not taxation for a private purpose, nor unequal taxation, nor unjust discrimination, nor legislative exercise of judicial power.   In *State* v. *Tappan*, nothing is said about the

right of jury trial.   The statement that the legislature cannot compel a town to pay bounties for enlistments, and that there must first be a judgment, may refer to the line between legislative and judicial power.

In *Gage* v. *Graham*, 57 Ill. 144, a law appointing commissioners to fix the amount of certain municipal liabilities was declared unconstitutional because the constitution of Illinois forbids the delegation of corporate affairs to any but elected corporate officers.   In *Sanborn* v. *Rice Co.*, 9 Minn. 273, commissioners were authorized to audit and adjust a claim against a county board, and it was held (1) that this was a usurpation of judicial power, and, (2) in answer to the objection that the board was a quasi corporation, for whose affairs such proceedings were allowable, that the claim was not in fact against the quasi corporation, but against the tax-payers.   In *Plympton* v. *Somerset*, 33 Vt. 283, it was held that a town has a constitutional right of jury trial in a highway case; but the attention of the court was not called to the questions whether jury trial is a granted public as well as a reserved private right, and whether the defendants' highway duty and liability were private or public.   The distinction between the public character of the rights involved in the defence of that case and the private character of those reserved in the bill of rights escaped notice.   The same thing happened in *Copp* v. *Henniker*, 55 N. H. 179, and in other cases.   In *Dow* v. *Norris*, 4 N. H. 16, 20, this court, overruling its decision of a constitutional question in *Lewis* v. *Foster*, 1 N. H. 61 (Smith (N. H.) 420), say,— "The question  .  .  .  was neither raised nor considered, and we cannot view it as a decision of the point."   In *State* v. *Holmes*, 38 N. H. 225, 230, overruling the decision of a constitutional question in *Adams* v. *Hackett*, 27 N. H. 289, 293, 294, the court say,—"We do not feel pressed by that authority, as we should if the question had been there presented in a way which called upon the court to give it a careful and extensive examination."   According to our precedents, a point is not settled by decisions in which it was overlooked.

It is settled, if anything can be settled by weight of authority, that the defendants are a public corporation, a mere piece of governmental machinery, subject to legislative control; that their corporate rights, so far as they are involved in this suit, are public to such an extent and in such a sense that they stand in the position the state would occupy if it had, as a single corporate person, assumed the highway liability which it has assumed as many corporate persons; and that these public rights are not protected by the reserved private right of jury trial.   In their purely public capacity the defendants stand, in this case, for the state, and as the state.   For all the purposes of this inquiry they are the state. For these purposes there is no difference between highway liability assumed and retained by the state as one undivided public body, and the same liability assumed and retained, through legis-

lative power, by the state as several hundred municipal parts of the same public body. The parts are not greater than the whole, nor do they differ from the whole in any respect material in this case. The highway liability of all the parts is a liability assumed by the whole, and, for convenience, divided. Its legal character is not affected by its division into parts corresponding to territorial divisions of the state. The taxation needed to pay damages for neglect of the assumed duty is for a purpose equally public, whether the public undertake to perform the duty through agents called state officers, or through agents called towns and town officers. To authorize compulsory municipal taxation for the public purpose of paying demands, either of a legal character or founded only on moral obligation and justice (Cool. Con. Lim. 230, 380, Cool. Tax. 127, 128, 688, Dil. Mun. Cor., *s.* 75), the constitution does not require the assessment to be approved by a unanimous judicial decision of twelve men.

The state may authorize selectmen to contract upon the credit of the town for property or labor requisite to the fulfilment of town duties, as, for example, the repair of bridges, the relief of paupers, or the supply of liquors for the town agency. *Rich* v. *Errol*, 51 N. H. 350, 356; *Wells* v. *Goffstown*, 16 N. H. 53. The legislature may go beyond mere authorization, and lay these duties upon selectmen, and require their performance to be enforced by mandamus (*Hall* v. *Selectmen of Somersworth*, 39 N. H. 511), and by indictment. *State* v. *Hoyt*, 23 N. H. 355; *State* v. *Woodbury*, 35 N. H. 230, 234; *State* v. *Fitts*, 44 N. H. 621. A unanimous vote of a town instructing the selectmen not to perform duties thus laid upon them by the state would be of no effect. Such a vote would not make it their duty to suffer the penal consequences of refusing to perform their statutory duties. It is the duty of selectmen to pay for the support of a pauper if they have funds and are satisfied of the liability of the town. *Andover* v. *Grafton*, 7 N. H. 298, 303. In the allowance and payment of claims against towns and counties, out of the proper public treasury, selectmen and county commissioners may be compelled, by statute, mandamus, and indictment, to act, not as mere municipal agents, controllable by municipal orders, but as public servants bound to disregard all instructions except those given by the law of the state. The legislative power that now authorizes local boards to allow claims against the public without a formal judicial trial, can authorize the same boards to do the same thing with a trial. In such judicial work (*Salisbury* v. *Merrimak County*, 59 N. H. 359, *Pike* v. *Middleton*, 12 N. H. 278, 283) a trial is not unconstitutional. It is settled, in *State* v. *Albee*, 61 N. H. 423, that a jury trial in a particular county is not a constitutional right of the public. It is settled, in *Farnum's Petition*, 51 N. H. 376, that the public is not protected by the constitutional exemption from retrospective legislation. These decisions are sound, and should not

be overruled.    Until they are reversed, it cannot be held that the
public has all the rights reserved in the bill of rights.    Nor can
it be properly held that the general imposition and special adju-
dication of public duties, liabilities, and burdens by the legislature,
selectmen, and commissioners, without juries, from 1784 to the pres-
ent time, has been a continual violation of the constitution.    It fol-
lows that "municipal corporations, being creatures of the legisla-
tive power and subordinate parts of the government of the state,
are subject to the legislative will to the extent that it may provide
for the appointment of a tribunal for the adjustment of claims
against them without a jury trial." *Cleveland* v. *Board of Finance*,
38 N. J. Law 259, 266.

*Case discharged.*

ALLEN, BLODGETT, and CARPENTER, JJ., did not sit: STANLEY
and CLARK, JJ., concurred.

SMITH, J., dissenting.    In *Copp* v. *Henniker*, 55 N. H. 179,
decided in 1875, it was held, upon the greatest consideration, that
the right of trial by jury is secured to towns by the constitution.
So recent a decision by this court of a question of such magnitude
ought not to be reconsidered, much less overturned, except upon
an occasion of the gravest moment.    The present is not of that
character.    If towns did not have the right when this motion was
made (November, 1879), they have it now under the act of August
19, 1881 (Laws 1881, *c.* 106).    If the defendants have no right
to a jury trial, no more has the plaintiff a right to a reference.
The motion is addressed to the discretion of the court (G. L., *c.*
231, *ss.* 9, 10, *Dodge* v. *Stickney*, 61 N. H. 607).    It should be
denied without considering the constitutional question.    No legal
right of either party is involved.    A decision overruling *Copp* v.
*Henniker* will have no effect except to authorize the court to send
this case, and such other like cases as were pending when the act
of 1881 was passed, to a referee, notwithstanding the town's objec-
tion.    Never since the adoption of the constitution of 1792 until
the making of this motion, or, at least, until *Copp* v. *Henniker*
came before the court, has it been denied or questioned that art.
20 of the bill of rights guarantees to towns the right to trial by
jury.    A practical construction of the constitution, acquiesced in
for a century by the legislature, by the courts, and by all parties
to judicial proceedings, ought not to be disturbed unless it is
shown to be clearly wrong.    The action of the legislature in 1881,
there is reason to believe, was prompted, not for the purpose of
conferring upon towns a right which they did not possess under
the constitution, but to remove the doubt of its existence which
this motion raised.    The unquestioned practice, immediately after
the constitution took effect and ever since, of trial by jury in the
numerous highway suits is satisfactory if not conclusive evidence

that the framers of the constitution did not understand such trials to be within the exception of "cases in which it has been heretofore otherwise used and practised." Towns have been liable to travellers for injuries caused by defective highways, substantially as they are at present, ever since the provincial act of 1719. Prov. Laws, ed. 1726, *p.* 151, ed. 1761, *p.* 116, ed. 1771, *pp.* 154, 155; Act of February 17, 1786; Laws, ed. 1797, *p.* 313; Act of July 3, 1829, Laws, ed. 1829, *c.* 48; Laws, ed. 1830, *p.* 580; Rev. Sts., *c.* 57, *s.* 1; Gen. Sts., *c.* 69, *s.* 1; G. L., *c.* 75, *s.* 1. There is good reason to believe that in actions on the statute of 1719 the right of trial by jury was secured to the towns by the provincial laws. *Copp* v. *Henniker*, 55 N. H. 179, 190–192. However that may be, we have no evidence, or even tradition, that the actions were not in practice tried by jury. If the practice before the adoption of the constitution was different from what it has been since, no satisfactory reason has been suggested, or is perceived, for the change. If it was the same, these cases come within the very letter of art. 20 of the bill of rights, and it makes no difference that towns are political subdivisions of the state.

The fundamental ideas in the argument for the plaintiff seem to be, that a municipal corporation is a part of the sovereign, and cannot be sued without the sovereign's consent; that the right of trial by jury was reserved by the people in art. 20 when they formed themselves into a government; and that the reservation cannot be construed into a grant of the right to the sovereign. In determining the constitutional rights of municipal corporations it is necessary to inquire with what duties they are charged and what powers they possess.

Towns are political subdivisions of the state, created for the more convenient administration of the government. "Strictly, a municipal corporation is an institution designed to regulate and administer the mere local or internal concerns of the incorporated place in matters pertaining to it, and not relating directly to the people of the state at large. But in this country, much more generally than in England, it is the practice to make use of the municipality, or of its officers, as agencies of the state for the exercise, on its behalf, of public, in addition to corporate, duties and functions." 1 Dill. Mun. Cor., 3d ed., *p.* x of preface. They possess a double character—the one, governmental, legislative, or public; the other, proprietary or private. *Ib.*, *s.* 66; *Eastman* v. *Meredith*, 36 N. H. 284, 292. As public corporations, they are empowered to hold property, and are invested with many powers to enable them to answer the purposes of their creation. They may be divided, united with other towns, or otherwise modified, as the public exigencies may require. But "in the incorporation of a town there is no implied power reserved to take its property arbitrarily and give it to another town. Corporations, both public and private, may be conceded to stand in this respect on the same

ground as individuals." *Bristol* v. *New Chester*, 3 N. H. 524, 533, 535; *Terrett* v. *Taylor*, 9 Cranch 43; *Dartmouth College* v. *Woodward*, 4 Wheat. 518, 663. The legislature cannot compel one town or city to contribute to the payment of the debts of another (*Matter of Lands in the Town of Flatbush*, 60 N. Y. 398), to contract a debt for local purposes against its will (*People* v. *Detroit*, 28 Mich. 228, *People* v. *Chicago*, 51 Ill. 17, *People* v. *Batchellor*, 53 N. Y. 128), nor create a debt from one county to another if nothing was due at the time of the passage of the act (*Hampshire* v. *Franklin*, 16 Mass. 76, 84). Grants of property to public corporations cannot be resumed by the sovereignty. *Terrett* v. *Taylor* and *Dartmouth College* v. *Woodward*, *supra*. When the state deals with a municipal corporation on the footing of contract, the municipality is to be regarded as a private company. *Richland* v. *Lawrence*, 12 Ill. 8. These cases are sufficient to show that a municipal corporation does not possess all the immunities and rights of the sovereignty of which it is a part.

If the guaranty of a jury trial, in cases not within the exception in art. 20, does not apply to towns, no other guaranty of the constitution applies to them. They are protected by all or by none of the provisions of that instrument. But a town's property cannot be taken for public uses without compensation. Bill of Rights, art. 12; *Bristol* v. *New Chester*, 3 N. H. 524, 534, 535; *Londonderry* v. *Derry*, 8 N. H. 320. A right of action for the support of a pauper vested in one town against another cannot be "constitutionally cut off by any legislative enactment, as it would be retrospective in its operation and therefore unconstitutional and void." Art. 23; *Pembroke* v. *Epsom*, 44 N. H. 113, 114. Acts of a resident in a town which, at the time they took place, did not give him a settlement in that town, cannot be made to have that effect by subsequent legislation. *Dunbarton* v. *Franklin*, 19 N. H. 257, 261, 263. An act providing that a part of the expense of a new highway in any town may, in certain cases, be imposed upon neighboring towns, cannot constitutionally apply to pending cases. *Kennett's Petition*, 24 N. H. 139. A fund, granted by the state to a town, cannot constitutionally be subsequently declared by act of the legislature to belong to individuals. *Spaulding* v. *Andover*, 54 N. H. 38, 52–55. Towns are protected by art. 15 of the bill of rights, and cannot be held to answer for any offence until the same is fully and plainly, substantially and formally, described. *State* v. *Canterbury*, 28 N. H. 195, 228. All these cases must be overruled in order to hold that towns, in "controversies concerning property," are not entitled to the constitutional guaranty of trial by jury, unless it is shown that in such cases it was "otherwise practised" before the constitution was adopted.

It is impossible to reconcile the foregoing decisions with the doctrine that the bill of rights was framed for the protection of

personal rights of individuals exclusively. It must follow that a municipal corporation is included within the protection afforded by articles 16, 17, and 18, which provide that no subject shall be liable to be tried after an acquittal, for the same crime or offence (art. 16) ; that no crime or offence ought to be tried in any other county than that in which it is committed (art. 17) ; and that all penalties ought to be proportioned to the nature of the offence (art. 18).

" In all controversies concerning property, and in all suits between two or more persons," except, &c., " the parties have a right to trial by jury." The language is broad enough to include towns. In its literal terms it is applicable to them. Indeed, the words " in all controversies respecting property" have no significance unless they are applicable to corporations. Trial by jury is secured to individuals as perfectly without as with these words. No reason has been given, no reason can be given, why constitutional guaranties of property rights should not apply as well to artificial as to natural persons, as well to public as to private corporations,—in short, to all entities endowed by law with the capacity of holding property. Literally interpreted, they apply to them. Why should they be deprived by construction of the protection which the language is broad enough to secure, and which is as important to them as to individuals ? Upon what ground can it be assumed that the framers of the article did not intend that the property of towns, as well as of persons, should be protected?

Towns can never be absolute owners of any property. They hold the legal title, but always in trust for the purposes appointed by law, and for the benefit of the citizens, who are the beneficial owners. Every tax-payer is a *cestui que trust*, and has a direct and valuable interest in the property. His individual estate is directly liable for the town debts. How can it be inferred that the makers of the constitution, where they used language pertinent for the purpose, did not intend to protect these rights, as well as the more immediate and direct rights of property ?

The people have stipulated that the right of trial by jury in all controversies respecting property " shall be held sacred," and, " in order to reap the fullest advantage of the inestimable privilege of trial by jury," that none but qualified persons shall be appointed to serve as jurors. The solicitude thus shown by the framers of the constitution may properly be considered in its interpretation. Any restriction or limitation of this " inestimable " privilege not warranted by the clear words of the instrument should come, not through judicial construction, but from the direct action of the people.

In *Copp* v. *Henniker*, 55 N. H. 179, 192, *Ladd*, J., says,—" In giving to the party damaged a right of action against the town, without specifying the form of the remedy, or the court in which it was to be sought, or the course of the judicial proceedings to be

adopted, the legislature gave a right of action to be pursued according to the usual practice in cases of torts, and the ordinary course of the common law. It has never been doubted, so far as I am aware, that the statute of 1786, and all its subsequent amendments, give both parties a right of trial by jury, not, indeed, in express terms, but by natural and necessary implication. Of the universal understanding on this point there can be no doubt. It is impossible to hold that the act of 1786 did not change the previous practice, if the previous practice was to try this class of cases without a jury. And the decision in *Baker* v. *Holderness*, 26 N. H. 110, 114—where the error of *Backus* v. *Lebanon* [11 N. H. 19], was corrected—is conclusive upon the point that the right to a trial by jury, existing in this class of cases, from 1786 to the adoption of the constitution, does not leave this class 'among the cases in which it has been heretofore otherwise used and practised,' but shows it to be among the cases in which this mode of procedure is to be held sacred.

"*Pierce* v. *State*, 13 N. H. 536, 542, is also an authority to the point that 'heretofore' in the constitution means before 1792, and that 'the laws which have been heretofore adopted, used, and approved in the province, colony, or state of New Hampshire, and usually practised on in the courts of law,' refers to the provincial laws as modified by statutes passed in the period between 1776 and 1792. It cannot be doubted that the act of 1786 gave the right to a trial by jury in this class of cases, and that this case is not one of the 'cases in which it has been heretofore otherwise used and practised,' within the meaning of the constitution."

To the views thus expressed by Judge *Ladd* there is no satisfactory answer.